**In re John A. DURDEN, Jr., and Arthur P. Kurtz, Jr.**

**Appeal No. 85–601.**

United States Court of Appeals, Federal Circuit.

June 10, 1985.

Robert C. Brown, Group Patent Counsel, Danbury, Conn., argued for appellants.

Harris A. Pitlick, Associate Sol., U.S. Patent and Trademark Office, Arlington, Va., argued for appellee. With him on the brief were Joseph F. Nakamura, Sol., and John W. Dewhirst, Associate Sol., Washington, D.C.

Before MARKEY, Chief Judge, RICH, Circuit Judge, and NICHOLS, Senior Circuit Judge.

RICH, Circuit Judge.

This appeal is from the decision of the U.S. Patent and Trademark Office (PTO) Board of Appeals (board) affirming the examiner's rejection of the single claim remaining in application serial No. 148,557, filed May 9, 1980, for a process of making certain compounds [1] as obvious under 35 U.S.C. § 103 in view of a U.S. patent to Punja, No. 3,843,669. We affirm.

### Background

Quoting appellants' brief, they filed a parent application June 21, 1976, "claiming novel oxime compounds, novel insecticidal carbamate compounds and a novel process for producing the carbamate compounds, employing the novel oxime compounds as the starting materials." A patent issued in 1980 on the parent application claiming carbamate compound *products*. A divisional application [2] was filed claiming the oxime compound *starting materials*, and another patent issued thereon. The application at bar, which is another division, claims the *process* of making the novel carbamate products from the novel oxime starting materials and the one remaining claim now before us stands rejected as directed to obvious subject matter in view of the single reference patent to Punja, assigned to Imperial Chemical Industries.

---

1. The title of the application, which is misleading, is "PESTICIDAL CARBAMATE ESTERS OF 2–OXIMINO–TETRAHYDRO–1,4–OXAZIN–3–ONES AND OF 5–OXIMINO–1,3–OXAZOLIDIN–4–ONES." The single remaining claim, 36, which is on appeal is directed to "A method of preparing" such compounds. Applicants' assignee, Union Carbide Corporation, the real party in interest, filed a parent application, serial No. 698,029, June 21, 1976, of which the present application is a division. Two patents have issued on that application or a division thereof, No. 4,235,902, Nov. 25, 1980, claiming carbamate *products*, and No. 4,303,788, Dec. 1, 1981, claiming oxime *starting materials*. Apparently, the title of the parent application was carried over to this divisional application. We do not reproduce the page-long and complex claim as it is unnecessary to our discussion.

2. Serial No. 148,511, filed May 9, 1980, like the application at bar.

In his Answer to appellants' brief before the board, the examiner said:

> Punja discloses ... the instant process with similar reactants.

.        .        .        .        .

Applicants urge that the starting material of Punja [has] differences.... These differences appear to be two in number. Firstly, the instant process is limited to 6-member ring compounds as starting materials. The 5-member ring compounds were recited in claim 36 as filed. Secondly, in Punja the ring carbonyl group is adjacent to the ring nitrogen, which is adjacent to the ring carbon bearing the oxime group. In the instant process the ring carbonyl is between the ring nitrogen and the ring carbon bearing the oxime group....

The instant and the prior art processes do not take place on ring atoms or atoms directly attached to ring atoms. The reaction takes place on a hydrogen atom attached to an oxygen atom, which is attached to a nitrogen atom, which is attached by a double bond to a ring carbon atom, the $= NOH$ group.

Applicants have presented no evidence that an oxime group on compounds with 5- or 6-membered rings will react differently. Also, no evidence has been presented to substantiate the statement that the location of ring atoms, particularly in 1,4-oxazines have [sic, having] carbonyl groups and oxime groups, will influence the reaction or product of the reaction, of the oxime group.

... While the instant starting material and instant product may be patentable, the instant process and the process of Punja are drawn to [the] same process, reacting an oxime group to form a carbamate ester.

Against this background, appellants' brief in this court makes the following express concession:

> To simplify the issues in this appeal appellants concede that the claimed process, apart from the fact of employing a novel and unobvious starting material and apart from the fact of producing a new and unobvious product, is obvious. Appellants do not argue that differences in the chemical structure of either the starting oxime compound or the product produced would be expected to affect the reaction in any way which might render the claimed process unobvious.

Just previous to that concession, the brief also makes this additional admission:

> Generally speaking, it is known that heterocyclic oxime compounds [which appellants' oximes are conceded to be] ... can be reacted with known carbamoyl halide compounds to produce carbamate compounds, as evidenced by Punja U.S. Patent No. 3,843,669....

Appellants' "Summary of the Argument" states:

> A chemical process which (a) employs a novel and unobvious starting material *or* (b) is for the production of a novel and unobvious product compound *or* (c) which employs a novel and unobvious starting material *and also* is for the production of a novel and unobvious product compound, is patentable, regardless of the extent of other similarities to prior art processes. [Emphasis ours.]

This clear statement is made even clearer by appellants' concise statement of the issue, which we repeat as our own.

### THE ISSUE

"The issue to be decided is whether a chemical process, otherwise obvious, is patentable *because* either or both the specific starting material employed and the product obtained, are novel and unobvious." [Emphasis ours.]

### OPINION

Of course, the appellants say the process *is* patentable. But with the issue that broadly stated, the answer must be "Not necessarily." For reasons unknown to us, the board convened a 16-member panel to hear the appeal. It then split 9 to 7 in

deciding it.[3] The issue is far from new. The conflicting views in the board are reminiscent of similar conflicts in our predecessor, the Court of Customs and Patent Appeals (CCPA). *See In re Larsen*, 292 F.2d 531, 130 USPQ 209 (1961). Dissent has existed within the board on the issue since prior to the 1952 Patent Act which introduced § 103 into the picture. *See Ex parte Wagner*, 88 USPQ 217 (Bd.App.1950) (method of drilling a well with novel drilling mud; rejection reversed but with vigorous dissent asserting decision was contrary to law as propounded in numerous CCPA decisions cited). More recent conflict within the board is manifest from *Ex parte MacAdams*, 206 USPQ 445 (Bd.App.1978)[4] (method of molding novel plastic composition by known procedure; 9-member panel reversed examiner's rejection by 7-to-2 vote but made new rejection on new references unanimously; three opinions filed).

■ Appellants' brief opens the argument by stating that it "is apparent that existing case law on the issue presented herein is subject to different interpretations. There can be no disagreement that uncertainty exists." Their brief then forthrightly states that appellants' position is that the dissenting opinion of the board members "accurately sets forth the law on these issues as it is and as it should be."[5] Indeed, that is the principal "argument" made. Though the burden is on appellants on this appeal to persuade us that the board majority is wrong, they have not even mentioned the CCPA precedent principally relied on by the board majority, the *Albertson* case hereinafter discussed. No reply to the PTO's brief citing added precedent was filed. Their other main argument is that § 103 requires their claimed invention to be considered "as a whole," a proposition with which we agree, and that so considering it, "both the starting materials and the final products individually constitute a part of '... the subject matter as a whole ...' sought to be patented, which must be considered in assessing the obviousness of the claimed process." Appellants' brief also relies on and quotes at length from the dissenting opinion of the late Judge Arthur Smith .of the CCPA in *Larsen*. The substance of appellants' arguments is that prior decisions have been wrong and we should now follow dissenting opinions in the board and the CCPA. But no reason is ever given for doing so except that appellants would have it so. They simply rely on their own interpretation of § 103.

■ The board majority relied on a case decided a few years after *Larsen, In re Albertson*, 332 F.2d 379, 141 USPQ 730 (CCPA 1964). It saw no way to distinguish *Albertson* from the present case, nor do we. This court is bound by clear precedents in the CCPA. *South Corp. v. United States*, 690 F.2d 1368, 215 USPQ 657 (Fed. Cir.1982). The same arguments appellants are making here were made in *Albertson*. The starting materials used in and the product produced by the claimed process were the subjects of allowed claims; the process claims were rejected as obvious in view of references showing the same chemical reduction process applied to other materials. The board affirmed the rejection and the CCPA affirmed the board. *Larsen* was relied on by the *Albertson* board and the appellant attempted to distinguish it, together with two similar CCPA decisions, on the ground that "the specific reactants in a process 'are a vital, significant part of any process,' and therefore the 'use of an

---

3. *Majority:* Goldstein (author), Milestone, Merker, Katz, Pellman, Lovell, Bjorge, Steiner, and Rzucidlo; *dissenting:* Goolkasian (author), Mattern, Serota, Blech, Seidleck, McKelvey, and Winters. Only two opinions filed.

4. The board majority opinion concludes with this statement:
   To the extent that this decision is in any way inconsistent with the published Board of Appeals decisions in *Ex parte MacAdams*, 206 USPQ 445, and *Ex parte Klioze*, 220 USPQ 91 [1983], those decisions are hereby overruled.

5. The board opinions not having been published but having been made of public record by being filed in this appeal, it would be of service to the bar to publish them.

unobvious starting material renders a process unobvious'." The CCPA said:

> We do not agree with appellant's proposition that the "use of an unobvious starting material renders a process unobvious." Were this true, every step, for example, dissolving or heating, when performed on a new compound would result in a patentable process. We reiterate that all of the evidence must be considered on the "subject matter as a whole," from the viewpoint of one skilled in the art, in the determination of obviousness, and not simply the patentability of one of the starting reactants in a process.

■ The CCPA there also made clear its approach to the issue, which is the same approach we take here and in all like cases, namely, "that each statutory class of claims should be considered independently on its own merits. *In re Wilke et al.,* 50 CCPA 964, 314 F.2d 558, 136 USPQ 435; *In re Adams et al.,* 50 CCPA 1185, 316 F.2d 476, 137 USPQ 333."

■ We reiterate another principle followed in obviousness issue cases, which is to decide each case on the basis of its own particular fact situation. What we or our predecessors may have said in discussing different fact situations is not to be taken as having universal application.

The opinion joined by the dissenting board members states that they, like the majority, were unable to distinguish *Albertson,* but that they "consider it no longer viable." They had convinced themselves that in view of subsequent CCPA decisions, on other fact situations, *"Albertson* would be decided differently today." Even were that so, the case still stands as a precedent until overruled. Their principal support for that erroneous surmise appears to have been the CCPA opinion in *In re Kuehl,* 475 F.2d 658, 177 USPQ 255 (CCPA 1973). The

board majority also considered *Kuehl* at length and found it distinguishable on the ground that the process there claimed and found to be unobvious was a process of cracking hydrocarbons by means of the newly invented catalyst ZK–22, which cracking process was not predictable on the basis of mere possession of the catalyst, whereas the process claimed in *Albertson,* like the process claimed here, was predictable and obvious to those of ordinary skill in the art from the "prior art."[6] The board majority found the distinction between the cases "readily apparent," and so do we.

■ We find it unnecessary to discuss the other cases cited by the dissenters on the board. We suspect the possibility, in connection with these highly debatable matters, that there has been a failure to distinguish between novelty and unobviousness. Of course, an otherwise old process becomes a *new* process when a previously unknown starting material, for example, is used in it which is then subjected to a conventional manipulation or reaction to produce a product which may also be *new,* albeit the *expected* result of what is done. But it does not necessarily mean that the whole process has become *unobvious* in the sense of § 103. In short, a *new* process may still be obvious, even when considered "as a whole," notwithstanding the specific starting material or resulting product, or both, is not to be found in the prior art.

■ To conclude, and possibly to put an end for now to this potentially endless debate on what the "law" is, which is not unlike sitting under a tree discussing good and evil with Socrates, we revert to appellants' statement of the issue, supra, and the use of the word "because" therein.

■ A process, after all, is a manipulation according to an algorithm, as we

---

**6.** In *Kuehl,* the three inventions claimed were the catalyst ZK–22, the method of making ZK–22, both held patentable, and the invention of claim 11 on appeal which read:

11. A hydrocarbon conversion process which comprises contacting a hydrocarbon charge under catalytic cracking conditions with the composition of claim 6 [ZK–22].

have learned in recent years—doing something to or with something according to a schema. The argument is that an otherwise old process with a predictable outcome is *unobvious because* it is applied to a new material, notwithstanding the new material is similar or analogous to materials identically manipulated or treated before. To anyone other than a patent lawyer and therefore unfamiliar with the mysteries of patent claims, this would make little sense, we believe. Appellants conclude their argument with the assertion that they "are entitled to claim their invention as they see fit," which is indisputable. 35 U.S.C. § 112, second paragraph. But when it comes to determining whether their claim is allowable under § 103, as was said in *Albertson* and elsewhere, we must treat the claim as we find it. We hold the process claim before us to be directed to obvious subject matter in view of Punja. We do not find that *Albertson* has been previously overruled sub silentio, as the dissenters believe, and we do consider it a viable precedent which fully supports this decision.

We are sure that there are those who would like to have us state some clear general rule by which all cases of this nature could be decided. Some judges might be tempted to try it. But the question of obviousness under § 103 arises in such an unpredictable variety of ways and in such different forms that it would be an indiscreet thing to do. Today's rule would likely be regretted in tomorrow's case. Our function is to apply, in each case, § 103 as written to the facts of disputed issues, not to generalize or make rules for other cases which are unforeseeable. The task may sometimes be easy and sometimes difficult; and as this case shows, not all of those required to decide may agree. But such is the way of the "law."

For the foregoing reasons, the decision of the board is *affirmed.*

AFFIRMED.