**KEY MANUFACTURING GROUP, INC., Plaintiff,**

v.

**MICRODOT, INC., Defendant.**

Civ. A. No. 81–71775.

United States District Court.
E.D. Michigan, S.D.

Sept. 9, 1987.

Jerold I. Schneider, Cullen, Sloman, Cantor, Grauer, Scott & Rutherford, P.C., Detroit, Mich., for plaintiff.

George E. Frost, Chester L. Davis, Jr., Barnes, Kisselle, Raisch, Choate, Whittemore & Hulbert, P.C., Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

PHILIP PRATT, Chief Judge.

Key Manufacturing Group, Inc. (Key), a Michigan corporation, brings this action for patent infringement against Microdot, Inc. (Microdot), a Delaware corporation, which has a manufacturing facility in Sterling Heights, Michigan. Both Key and Microdot manufacture capped wheel nuts for attaching a wheel to an automobile axle. The Towne Robinson Fastener Company, (Towne Robinson) is a division of Key which manufactures capped wheel nuts. Towne Robinson is an assignee of patents which describe several types of capped wheel nuts. Among these patents are U.S. patent 4,123,961 and reexamined U.S. patent B1–4,123,961. In this suit, Key alleges that Microdot's capped wheel nuts literally infringe these patents or infringe them under the doctrine of equivalents. A non-jury trial ended on May 11, 1987, and the parties completed post-trial briefing on July 13, 1987. Below are the court's findings of fact and conclusions of law.

### I. *Patent 4,123,961*

#### A. Description of the Patent

The patent in suit is for a capped wheel nut which fastens a wheel to an automobile axle. The axles of most automobiles have a ring of threaded studs which extend outwardly from each axle end. The automobile wheel has a corresponding ring of holes through which the studs pass. Wheel nuts are then threaded on the studs to secure the wheel to the axle. All wheel nuts have a number of "wrench flats" which allow a tool to tighten the nut on the wheel or loosen it for purposes of servicing or changing the wheel. The wheel nuts and studs at the hub of the wheel may be hidden by a cover which attaches to the wheel to protect the nuts and studs and improve appearances. Alternatively, the

wheel nuts may have a protective sheath on them to protect the nut and the stud without an additional cover. These sheathed wheel nuts are referred to as "capped wheel nuts." The cap may be made of a variety of materials, and may be attached to the nut body, sometimes called the nut insert, in a variety of ways.

The patent in suit calls for a stainless steel cap with polygonal sides which is fastened to the nut body by welding. The nut body has two "faces:" when threaded, the first face is in direct contact with the wheel. The court shall refer to this end as the "wheel face" of the nut body. The stainless steel cap slides over the second face, which is at the opposite end of the nut body and the wrench flats. The court shall refer to the second end as the "cap face" of the nut body. To facilitate the welding of the cap to the nut body, the patent calls for a nut body with a "continuous ring of substantial area" on the cap face of the nut body (hereinafter "welding ring"). By using pressure and electric current, the welding ring melts, spreads radially towards the edge of the nut body, and forms a bond between the cap and the nut body. In the alternative, the patent contemplates a number of weld nubs on the cap face of the nut body. The weld nubs serve the same function as the welding ring and collapse in a similar manner.

Welding on the end of the wheel nut creates a situation where any force applied to the weld during the loosening or tightening of the wheel nut will be in shear. "Shear" refers to two forces acting in opposite directions. As a person loosens the capped wheel nut, for example, the person is applying a force in one direction on the weld by using a wrench on the cap itself, while the tightened nut body is exerting a force in the opposite direction.

The patent claims do not describe the method for producing the capped wheel nut. An attached figure does show a cap-nut body assembly between two annular electrodes, each designed to conform to the wheel face of the nut body or to the stainless steel cap. The Summary of the Invention itself refers to particular levels of pressure, weld voltage, amperes and weld time used to manufacture the capped wheel nut successfully. The disclosure also describes those characteristics. The Summary goes on to note:

> As a result, heating occurs principally at the interface between the cap and the nut, at the ring area. The weld time is so short that the cap does not oxidize and the heating action does not cause the carbon in the stainless steel to migrate to the grain boundaries to lower its corrosion resistance. The heat applied to the nut is not sufficient to affect its hardness.

> The welding circuit illustrated is a simplified version of a conventional capacitor discharge circuit, and it should be understood that any type of welder circuit which can apply in extremely short duration; high current pulse to the interface between the cap and the nut, while the nut is being forced into the cap at the ring, could be used with present invention.

The court finds that this language demonstrates that the patent did not intend to identify a certain welding method to produce the manufactured device. Rather, it contemplated a manufacture with certain characteristics which, when welded with any number of different weld circuits, does not cause discoloration, lower corrosion resistance, nor decrease strength in the capped wheel nut.

In this regard, the language of the patent claims 1 and 8 bears close scrutiny. The claims from the original patent read as follows:

1. A nut having a central threaded aperture, polygonal sides, a first end adapted to engage a wheel, a second end having an end face extending at right angles to the axis of the nut and a sheet metal cap for the nut having a section extending over the polygonal sides and and (sic) end section adapted to cover the second end of the nut, said end section being connected to the section of the cap which covers the polygonal sides by a section formed fully around the perimeter of the cap and having an exten-

sion at right angles to the axis of the nut so as to be parallel to said end face, such connecting section being in juxtaposed contact throughout a substantial area with and welded to said end face, whereby forces exerted on the capped sides creating moments about the central axis of the nut will resist in shear forces exerted on the weld.

2. The nut of claim 1 wherein the cap is welded to the nut in a continuous line of weld extending fully around the central aperture.

3. The nut of claim 1 wherein the cap is formed of a stainless steel.

4. The nut of claim 1 wherein the end section of the cap is flat and extends fully across the end of the nut opposite to the first end.

5. The nut of claim 1 including a chamfered surface extending between the polygonal flats and the first end of the nut and wherein the cap has an angled section which contacts said chamfer.

6. The nut of claim 5 wherein the laterally extending section of the cap contacts said angled section.

7. The nut of claim 1 including a plurality of raised weld nubs formed on said nut surface having an extension laterally to the central axis of the nut, which act to contact said cap.

8. A capped wheel nut, including a nut body having a central threaded aperture, polygonal sides, and a conical end and a laterally extending end, and a sheet metal cap for the nut having a first section covering at least a portion of said polygonal sides and a second section covering the laterally extending end of the nut, said second section being in contact with the laterally extending nut end in a continuous ring of substantial area extending about and being normal to the central axis of the nut, said cap being welded to the nut at said ring so that forces exerted between the nut and cap during wrenching by forces exerted on the capped sides creating moments about the central axis of the nut will produce shear forces on the weld.

9. The capped nut of claim 8 wherein the nut body has a plurality of raised weld nibs formed about said surface having a lateral extension.

10. The nut body of claim 8 having a flange which extends radially beyond the polygonal sides and in which the cap is welded to the body at a lateral surface of said flange.

The claims of the reexamined patent read:
REEXAMINATION CERTIFICATE ISSUED UNDER 35 U.S.C. § 307
THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.
Matter enclosed in heavy brackets [ ] appeared in the patent, but has been deleted and is no longer a part of the patent; matter printed in italics indicates additions made to the patent.
AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

Claims 1 and 5–10 are determined to be patentable as amended.

Claims 2–4, dependent on an amended claim, are determined to be patentable.

1. A *decorative* nut *for holding a wheel on a motor vehicle and exposed to view on the wheel, said nut* having a central threaded aperture, polygonal sides, a first end adapted to engage a wheel, a second end *opposite said first end and* having an end face extending at right angles to the axis of the nut, and a sheet metal cap for the nut *and* having a section extending over the polygonal sides *of the nut* and [and] *an* end section adapted to cover the second end of the nut, *said section extending over the polygonal nut sides including a plurality of cap wrench flats respectively associated with and oppositely facing said polygonal nut sides, said cap wrench flats and said polygonal nut sides being disposed between said first and second ends of said nut,* said end section being connected to the section of the cap which covers the polygonal *nut* sides by a section formed fully around the perimeter of the cap and having an extension at right angles to the axis of the nut so as to be parallel to said end face, such connection section being in juxtaposed

contact throughout a substantial area with and welded to said end face, [whereby forces exerted on the capped sides creating moments about the central axis of the nut will result in shear forces exerted on the weld.] *the position of welded contact between the connecting section and the end face resulting in shear forces being applied to the weld in response to the application of forces on the capped wrench flats which create moments about the central axis of the nut.*

5. The nut of claim 1 including a chamfered surface extending between the polygonal [flats] *sides* and the first end of the nut and wherein the cap has an angled section which contacts said chamfer.

6. The nut of claim 5 wherein [the laterally extending section of the cap contacts] said angled section *extends from the section of the cap extending over the polygonal nut sides.*

7. The nut of claim 1 including a plurality of raised weld nubs formed on said nut [surface] *end face, said weld nubs* having an extension laterally to the central axis of the nut [,] which act to contact said cap.

8. A *decorative* capped wheel nut *for holding a wheel on a motor vehicle and exposed to view on the wheel,* including a nut body having a central threaded aperture, [polygonal sides, and] a conical end [and], a laterally extending end *and polygonal sides between said conical end and said laterally extending end.* [and a] *said* sheet metal cap for the nut *body, said cap* having a first section covering at least a portion of said polygonal *nut* sides and *including a plurality of cap wrench flats respectively associated with and oppositely facing the polygonal nut sides, said cap further having* a second section covering the laterally extending end of the nut, said second section being in contact with the laterally extending nut end in a continuous ring of substantial area extending about and being normal to the central axis of the nut, said cap being welded to the nut at said ring so that forces exerted between the nut and cap during wrenching by forces exerted on the [capped sides] *cap wrench flats* creating moments about the central axis of the nut will produce shear forces on the weld.

9. The [caped] *capped* nut of claim 8, wherein the nut body has a plurality of raised weld nibs formed about said [surface] *laterally extending end and* having a lateral extension.

10. The [nut body] *capped wheel nut* of claim 8 [having] *wherein said laterally extending end of said nut body is defined by* a flange which extends radially beyond the polygonal sides and in which the cap is welded to the body at a lateral surface of said flange.

Neither set of claims refers to a particular welding method, or to particular characteristics of the welding method in order to manufacture successfully the capped wheel nut of the patent in suit.

B. Development of the Capped Wheel Nut and Proceedings Before the Patent and Trademark Office.

Joseph Chaivre was an employee at Towne Robinson in Dearborn, Michigan. He became a full-time employee of this concern at about the same time that the predecessor of Key acquired the company in the late 1950s. Chaivre first acted as a sales representative for Towne Robinson, and became intimately familiar with the various fasteners sold to the automotive manufacturers in the Detroit area. Sometime in the early 1960s, he became aware that chrome plated wheel nuts for automobiles were susceptible to corrosion. After a wrench was applied to this wheel nut, the chrome plating would crack, exposing the wheel nut to moisture. This exposure would eventually lead to unsightly rust.

Chaivre set out to design a wheel nut that would have a more appealing appearance. As the automotive industry believed that the cost of a nut body made completely of stainless steel was prohibitive, Chaivre attempted to encase the conventional nut body with a stainless steel cap. The cap extended over one face of the nut body and the nut body's wrench flats. The

cap was manufacturered slightly larger than the nut body, and the cap was then pressed or crimped to the nut body as a means of attaching the one to the other.

Chaivre applied to the Patent and Trademark Office (PTO or Patent Office) and received U.S. Patent 3,364,806 ('806). The '806 capped wheel nut went into production. Eventually over 30 million such wheel nuts were sold.

Chaivre testified that Key learned of a problem with the '806 capped wheel nut soon after its introduction. Key's customers reported that after repeated wrenchings, the cap would often loosen and fall off. Not only would this deprive the nut body and the stud from the intended protection, but the nut body without the cap would be too small for the standard wrench that came with the car. The automotive industry representatives indicated that Towne Robinson would have to resolve this problem or the product would be useless.

Chaivre attempted various resolutions. First, he attempted to use an adhesive in combination with crimping. This method failed because the adhesive would crack with use. Second, he attempted to braze the cap to a copper plated nut body. Although this created a solid bond between cap and nut body, the copper would run, creating a bond with the adjacent cap-nut assembly. Soldering with silver caused the same result. Cold zinc plating was attempted, but although efficacious, the process was considered too expensive. As a last resort, Chaivre turned to welding. Chaivre testified that his understanding was that it was "virtually impossible" to weld stainless steel to a zinc plated nut body. Because of his inexperience with welding, he asked Al Jadach, a plant manager at Towne Robinson, for assistance.

Jadach took over the project in 1976 or 1977. Jadach had received both an undergraduate engineering degree and a master in business administration from the University of Michigan. Before becoming a plant manager at a Towne Robinson facility, he was a staff engineer at various companies, including another division of Key. During that time he accumulated extensive knowledge in mig, tig and spot welding. When approached by Chaivre with the idea of welding the cap to the body, he experimented with various methods and materials. He attempted to weld the cap to the nut body at various places, including on the wrench flats, at the corner of the cap, and on the cap face. He eventually found that welding at the end was best, and he pressed to obtain a nut body that would have a welding ring to optimize this welding technique. He prevailed in this requirement, leading to the application which resulted in the patent in suit.

Jadach also used various machines to accomplish the welds. Towne Robinson first bought equipment from Union Carbide, but this equipment proved unsatisfactory, both in terms of cost and manufacturing speed. During the use of the Union Carbide equipment, the capped welded wheel nuts were supplied to only one customer, the Chevrolet Division of General Motors Corporation. Although the Union Carbide equipment apparently met production requirements of this customer, Jadach believed it could not supply the eventual demand. He later selected a Ratheon machine which replaced the Union Carbide equipment in 1977. Ratheon welding machines are still in use today.

Chaivre, Jadach and Towne Robinson filed an application on April 1, 1976, for the patent in suit. On July 30, 1976, the same parties applied for a patent which was eventually designated 4,956,862. This application was very similar to the '961 patent application, but described a nut with welds on the wrench flats as well as welds on the end of the cap. On November 8, 1977, the '862 patent was issued. On November 7, 1978, the '961 patent was issued with the claims referred to above.

The transition from the crimped nuts to the welded nuts is of interest. Orders beyond the Chevrolet Division purchases of the '961 capped wheel nut began in January, 1978 and increased rapidly. Customers did not refuse to accept the traditional crimped, unwelded nuts, and they did not alter the lengthy process required to make an engineering change to allow for the new

wheel nut. Nevertheless, many customers did request that Key produce and supply the '961 capped wheel nut. Once it was shown that the welded nuts could withstand repeated application of wrenching forces, the automobile manufacturers required tests to show that the capped wheel nut would withstand twelve (12) on-off cycles. As a further indicia of the desirability of the '961 capped wheel nut, the automotive manufacturers changed their nut body design to conform to the design of the '961 patent. An informal survey conducted by Key indicated that its customers contrary to earlier experience would not accept the traditional crimped capped wheel nut, even if it were offered at a significantly lower price. Letters to this effect from Key customers were attached to the supplemental affidavit filed in the PTO. In an affidavit submitted during proceedings before the PTO, John Toth, a Key executive, indicated that sales of the '961 patent rose from 350,000 units in 1976 to 30,000,000 in 1979. Although these sales represent displacement of the old unit as the product of choice among the Key line of products, the rapid increase in sales demonstrates the desirability of the new product.

In 1981, Microdot began to produce a capped wheel nut with a similar configuration to the '961 unit. The Microdot capped wheel nut has a stainless steel cap which fits over the cap face of the nut body and the wrench flats of the cap body. Until 1984, the nut body did not have a welding ring, but rather had several welding projections or nubs on the cap face which fulfilled the same purpose as the welding ring. In 1984, at its customers' request, Microdot began manufacturing the nut body with a welding ring similar to that of the '961 capped wheel nut.

In addition, the end of the Microdot cap is not a plane at right angles with the cap axis. Rather, there is a 15 percent taper to the cap end. The nut body has a similar 15 percent taper to ensure a proper fit. At trial, a Microdot employee admitted that this taper is not required by any Microdot wheel nut purchaser. He also testified that a cap with a 15 percent taper does not differ in function from a cap without such a taper and that the Microdot and the '961 capped wheel could be used interchangeably.

A final difference between the two devices is the welding method employed by the two companies. The Key assembly is welded together by a form of resistance welding termed "capaciter discharge welding." The Microdot assembly is welded together by a form of resistance welding termed "alternative current welding."

In 1981, shortly after manufacture of the Microdot nuts, Key filed this suit, alleging infringement of the '961 patent.

During the course of preparing for trial, two requests for reexamination were made to the Patent Office. On January 17, 1983, Key filed the first request for reexamination. The request was based on the discovery of the Ives Patent, U.S. Patent 154,-255, and its possible effect on the '961 claims. On March 16, 1983, the PTO denied the request, determining that no substantial question of patentability was raised.

On December 18, 1984, Key filed a second request for reexamination. This request was followed by a request for reexamination filed by Microdot. Key asked for reexamination of claims 1–3 of the '961 patent based on the Luce Patent, U.S. patent 2,391,989, the Ives Patent, the British Patent 739,405, and the Chaivre–Jadach Patent, U.S. patent 4,018,133. Microdot requested reexamination on claims 1–3, 8 and 10 on the basis of the Luce Patent, the Ives Patent, and a publication of the American Welding Society.

On March 1, 1985, the PTO granted the request for reexamination, and on March 26, 1985, the two requests were merged. On August 15, 1985, the patent examiner rejected all of the '961 claims. The patent examiner listed two bases for this rejection. First, he determined that Luce anticipated all the '961 claims, making the '961 patent invalid under 35 U.S.C. § 102. Second, he determined that Luce, Ives and the McCardle patent made the '961 claims obvious, invalidating the '961 patent under 35 U.S.C. § 103. Key did not appeal this determination.

Instead, on September 13, 1985, Key filed amendments to the '961 claims and requested reconsideration of the rejection.

In its argument to the PTO, Key did not concede that the rejected claims were made obvious by the prior art described in the PTO's August 15, 1985 rejection, but offered the amendments to ensure that the device would be patentable. After telephone conversations with the examiner, representatives of Key filed a second request for reconsideration and amendments to the '961 patent claims on October 10, 1985, including additional affidavits and other documents.

The PTO granted the request for reconsideration on November 26, 1985. The PTO continued to reject all the claims on the '961 patent, even as amended. The patent examiner did not alter the determination that the claims could not be distinguished from the prior art, particularly Luce and Ives. The patent examiner also rejected Key's evidence of commercial success as inconclusive and contradictory. The patent examiner noted that Key had not shown the increase in sales in the '961 nut in 1977 and 1978, and had shown no great increase in overall sales of capped wheel nuts because of the introduction of the '961 nut. This rejection was reissued on January 7, 1986.

On March 10, 1986, Key filed a Third Amendment and request for reconsideration, along with supplemental affidavits. In addition to the amendments, Key attempted to bolster its contention of commercial success with a supplemental affidavit by John Toth. Toth stated that there was a high degree of consumer dissatisfaction with the crimped nut and that Key's market share would have declined had the '961 nut not been introduced. The informal survey referred to above was included in these submissions.

On May 7, 1986, the patent examiner granted Key's motion for reconsideration. He confirmed original claims 2–4 and allowed amended claims 1 and 5–10. The patent examiner offered the following justification for allowing the amended claims:

> The claims as amended are considered over the prior art of record particularly in view of applicant's affidavit and Exhibit filed on March 10, 1986. The affidavit and exhibit provide a showing of substantial commercial and a satisfaction of the long-felt need of providing decorative capped wheel nuts which are less likely to separate.

Defendant's exhibit 1e/10. Although this determination does not definitely state that the sole reason for allowing the claims was commercial success, there is not doubt that it was an important and perhaps crucial reason.

## II. *Patent Validity—Obviousness*

Microdot raises several defenses to Key's claim of patent infringement, with two main themes: (1) the patent is invalid, and (2) even if the patent were valid, Microdot did not infringe. If Key's patent is found to be invalid, there is not need to reach the question of infringement.

▮▮▮▮ To be valid, a patent must fulfill three criteria. First, the patent must be useful. 35 U.S.C. § 101. Second, the patent must be novel. 35 U.S.C. § 102. Third, the patent must be nonobvious. 35 U.S.C. § 103. In evaluating whether these criteria are met, the court must bear in mind that a patent has issued, and therefore carries a presumption of validity. 35 U.S.C. § 282; *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1570 (Fed.Cir.1986); *American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1351 (Fed.Cir.1984). It is up to the accused infringer to rebut this presumption.

▮▮▮▮ Microdot does not challenge the validity of the patent on the grounds of utility or novelty. Rather, Microdot's challenge rests solely on the crucial standard of obviousness. 35 U.S.C. § 103.[1] In order to

---

1. 35 U.S.C. § 103 states:

 A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvius at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

determine whether '961 is nonobvious, the court must engage in a four step inquiry. The court must determine:

(1) the scope and content of the prior art;

(2) the differences between the prior art and the claims at issue;

(3) the level of ordinary skill in the art; and

(4) any objective evidence of secondary considerations.

*Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966); *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 872 (Fed.Cir.1985); *Atlas Powder Co. v. E.I. DuPont de Nemours*, 750 F.2d 1569, 1574 (Fed.Cir.1984). These factors must be considered in light of the patent as a whole. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1568 (Fed.Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). The conclusions reached after these inquiries must of necessity be made on the individual facts of each case. Conclusions from the Federal Circuit on other cases are "not to be taken as having universal application." *In re Durden*, 763 F.2d 1406, 1408 (Fed.Cir.1985). Finally, the patent challenger has the burden to show obviousness by clear and convincing evidence. *Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 974 (Fed.Cir.1986).

### A. Scope and Content of the Prior Art

In determining the proper scope of the prior art, a person of ordinary skill seeking to improve the means for binding a cap to a wheel nut would not look only for solutions involving decorative wheel nuts, but would also consider other types of capped fasteners. Such solutions would be "reasonably pertinent" to the inventor's particular problem. *Application of Antle*, 444 F.2d 1168, 1171–72, 58 CCPA 1382 (1971).[2] Following are summaries of pertinent prior art patents. These summaries do not purport to be complete or technically accurate in all respects. Rather, the summaries are meant to provide a capsule statement of the technology involved in each patent.

2. Court of Customs and Patent Appeals decisions remain precedent unless overruled. *In re*

### *Ives*

U.S. Patent No. 154,255; July 29, 1874; Defendant's Exhibit 3a

This patent for a carriage axle nut contemplates a sheet metal cap covering the exposed surface of a nut. The cap is secured to the nut by "brazing or otherwise." The patent teaches that the cap and the nut each have a flange at the bottom. If some type of solder is placed between the two surfaces, the solder will flow when the assembly is heated, causing the two to form one part.

### *Schneider*

U.S. Patent No. 1,747,490; February 18, 1930; Defendant's Exhibit 3c

This patent calls for a two-piece tappet, where a head of chilled white iron is welded to a thin, tubular body of high carbon steel. The invention accomplishes the welding of these two different metals by placing a disk or button of soft metal, which welds easily to either substance, between the head and the body. These three parts are then welded together using an electronic welding device.

### *McCardle*

U.S. Patent No. 2,042,963; June 2, 1936; Defendant's Exhibit 3o

This patent is for making soles of sadirons. McCardle teaches, *inter alia,* that a nut body may contain welding projections to create a bond between the nut body and other components of a manufacture.

### *Luce*

U.S. Patent No. 2,391,989; December 30, 1942; Defendant's Exhibit 3f

This patent teaches that a cap may be welded to a nut body on a lateral area where the flange of the cap meets the flange of the nut. Luce teaches that by compressing the cap into the nut body, the flange of the two elements may be brought into contact. The two flanges may then be spot welded to each other. In this confirguration, "the wrenching torque applied to the [cap] does not strain the weld between the flanges." Luce at 2, col. 1, lines 44–45.

*Durden,* 763 F.2d at 1410; *South Corp. v. U.S.,* 690 F.2d 1368, 1370–71 (Fed.Cir.1982).

*Chaivre '806*

U.S. Patent 3,364,806; January 23, 1968; Defendant's Exhibit 3g

This patent describes a stainless steel cap which fits over a nut body, and is crimped or swaged together. The cap is decorative in nature and also prevents any damage to the nut body or the axle. The cap is polygonal and fits over the wrench flats of the nut.

*Chaivre '900*

U.S. Patent 3,955,900; June 22, 1971; Defendant's Exhibit 3h

This patent is similar to '806. The major difference is that the nut is crimped at two places. The cap is designed to engage where the cap face of the nut body and the cap meet, and also near the conical, wheel face of the nut body.

*Erdman*

U.S. Patent 3,955,231; May 11, 1976; Defendant's Exhibit 3i

This patent teaches a method of welding a cap to a nut body to create a capped nut which may be used for wheels or for other purposes. The nut has a decorative, as well as protective, purpose. This invention has two components, the nut body and the cap. The cap does not extend over the sides of the wrench flats. The patent contains no top view of the manufacture, so it is unclear how much area of the nut body the cap is intended to cover. The cap has an outwardly angled chamfer. When the cap and the nut are pressed together, and a resistance welding mechanism is applied, the chamfer collapses and an interior weld is created. This weld cannot be observed from the outside, creating an attractive appearance.

*Allmanna*

British Patent No. 3180/54; February 3, 1954; Defendant's Exhibit 3m

The Allmanna patent contemplates a design very similar to the Erdman patent. Again, there are two pieces to the assembly, the cap and the nut body. The cap is hemispherical, and does not extend over the wrench flats. Again, it is unclear how much of the nut body is covered by the cap. Instead of a chamfer, however, the cap contains a projection. The patent illustrates three different types of projections that may be used. One of these projections is a ridge which apparently runs along the perimeter of the cap. The cap and the nut body are welded together, the projection collapsing to form a seamless weld.

**B. Comparison of Patent Claims with Prior Art**

In comparing the prior art of the '961 patent, the court looks to the claims of the reexamined patent certificate issued July 22, 1986.

Claim One of the patent in suit calls for a decorative nut for automobile wheels, with a sheet metal cap fitting over the polygonal nut sides including a plurality of wrench flats closely associated with the polygonal nut sides. This structure is no different from Chaivre '806: "a sheet material sheath for the nut including side members in close proximity to the polygonal sides ...." Chaivre '806, claim 1. *See also* Chaivre '900, claim 1 ("a cap of resilient material disposed over the nut and having a plurality of side surfaces overlying the side surfaces of the nut").

Claim One of the patent in suit is distinguished from Chaivre '806 and Chaivre '900 on the basis of the manner of connecting the cap to the nut body. Both Chaivre '806 and '900 are attached by crimping or swaging. Not so as to the patent in suit. Claim One of the reexamined patent reads in relevant part:

[S]aid end section being connected to the section of the cap which covers the polygonal nut sides by a section formed fully around the perimeter of the cap and having an extension at right angles to the axis of the nut so as to be parallel to said end face, such connecting section being in juxtaposed contact throughout a substantial area with and welded to said end face, the position of welded contact between the connecting section and the end face resulting in shear forces being applied to the weld in response to the application of forced on the capped wrench flats which create moments about the central axis of the nut.

No comparable description exists in the prior art provided to this court. Welding the cap to the nut body on the end, thus creating a situation where shear forces will be applied to the weld, is not contained within any other patent.

Several patents do suggest such an outcome. Ives, for example, contemplates a nut body which is attached to a cap by brazing. The patent does not delineate directly what type of forces are applied to the braze, but they would apparently be shear forces. Ives does not, however, contemplate brazing merely at the end, but rather wherever there is contact between the cap and the nut body. Thus, not only would there be moments on the end face about the central axis when shear forces are applied to this capped wheel nut, but there would also be stress on the wrench flats of the capped carriage axle nut.

Luce also bears close examination in this regard. Luce teaches that if both the nut body and the cap have a flange, the cap may be satisfactorily spot welded to the nut body where the flanges of the two components meet. The summary of Luce, however, does not contemplate that a wrenching force would be applied directly to the cap. Rather, the summary appears to indicate that the bottom of the cap will be where the flanges meet. Under this scheme, a wrench would engage the capped threaded locking device along the edge of the nut body flange only, thus applying no force to the welds between the cap and the body. This is borne out by examining Figure 2 of Luce.

Careful examination of Luce, however, creates some confusion in this regard. Figure 4 of Luce is a cross-section of a second version contemplated under the patent. In this figure, the cap has a flange which meets the flange of the nut body. The cap also extends over the sides of the nut body's flange, engaging the entire hexagonal edge of the nut body. It would appear from this diagram, and the description of the Luce summary, that a wrench could only engage the Luce manufacture on the cap. If this were so, wrenching would apply shear forces against the weld. However, the summary, quoted *supra*, specifically indicates that "wrenching torque . . . does not strain the weld between the flanges." The court is at a loss to explain this apparent inconsistency. The parties did not raise this issue.

### C. Person with Ordinary Skill in the Art

No evidence was presented as to the level of ordinary skill of one experienced in the art. Clearly, this case involves one skilled in the art of welding. Such a person would not only be familiar with welding techniques for fasteners and automotive welding, but other welding as well. A person with an undergraduate degree in engineering and significant welding experience would be a person with ordinary skill in the art.

Jadach, Toth and Dennis all possess at least ordinary skill in the art.

### D. Objective Evidence of Secondary Considerations

*Graham, supra,* makes clear that secondary considerations should be taken into account where applicable. Such considerations include long felt but unsolved needs, failure of others, and commercial success. *Graham,* 383 U.S. at 17, 86 S.Ct. at 693. Skepticism of experts should also be considered, *Environmental Designs v. Union Oil Co. of Cal.,* 713 F.2d 693, 697 (Fed.Cir. 1983), as may copying of the claimed invention, rather than one within the public domain. *Windsurfing Intern. Inc. v. AMF, Inc.,* 782 F.2d 995, 1000 (Fed.Cir.1986).

The first such consideration in this matter is the skepticism of experts. The '961 nut involves welding a stainless steel cap to a zinc plated nut body. Chaivre, who initially discovered a method for fastening the cap to the nut body, testified that "in talking to people I was told to weld stainless [steel] . . . to a nut, was virtually impossible." Trial Transcript, May 4, 1987, at 43. Therefore, some evidence exists that the success of welding this combination of metals was unexpected and surprising. This weighs in favor of a determination of nonobviousness.

Second, the evidence does show that the Key capped wheel nut and the Microdot wheel nut are strikingly similar in appearance and manufacture. Although the two concerns may use different welding equipment, the wheel nut and caps are virtually indistinguishable. Key demonstrated at trial that Key caps may be welded to Microdot nut bodies, and Microdot caps may be welded to Key nut bodies. This similarity in construction also weighs in favor of a determination of nonobviousness.

Finally, the court considers the commercial success of the Key '961 capped wheel nut.[3] This secondary consideration takes on particular importance in this dispute. As related above, the claims approved in reexamination were initially not allowed because of obviousness. In approving the amended claims, the examiner relied in significant part on evidence showing a long standing need and commercial success.

Microdot argues that the '961 patented nut was a "dud." First, they point to evidence that the sales of the capped wheelnuts to Chevrolet, designated 367578, declined from 350,000 to 87,000 between Key's fiscal year 1976 (July, 1975 to June, 1976) and fiscal year 1977. Defendant's exh. 17 at 2. Second, Microdot claims that the fact that Key continued testing of the '961 nut at least as late as August, 1977, shows it was not an immediate commercial success. Third, Microdot contends that the automobile companies did not expedite the procedures to adopt the '961 part in car designs. Microdot concludes that the evidence shows that there was no commercial success at the time of the invention.

The court holds that ample evidence supports the conclusion that the Key nut was commercially successful. Between fiscal years 1976 and 1979, the sales of the '961 nut rose from 350,000 to over 30 million. Furthermore, the conduct of the automobile manufacturers supports a finding of commercial success rather than detracts

from it. These companies began to require impact tests to show that capped wheel nuts could withstand repeated tightening and loosening. The fact that they changed their nut body design indicates they thought the '961 capped wheel nut desirable. Finally, the letters from representatives of these companies show that they found the product to be much more desirable than the prior crimped capped wheel nuts.

Microdot's contention that evidence of post-application commercial success should be disregarded lacks merit. "Absent some intervening event to which success must be attributed, the delay in achieving the great commercial success of the claimed invention ... does not detract from the probative value of the evidence of the success." *Windsurfing Int'l*, 782 F.2d at 1000. Microdot contends that the knowledge of the inadequacy of the crimped wheel nut was not known until after the patent application, and is, therefore, the type of intervening factor contemplated by the court in *Windsurfing International*. However, the inventor of the crimped capped wheel nut, Chaivre, testified that Key received complaints almost immediately that the cap could detach from the nut body by wrenching forces. He also testified that the companies communicated to him that "if you don't straighten this problem out, we can't continue to use it." Trial Transcript, May 4, 1987, at 39. Chaivre's testimony as to his efforts before 1975 to find a solution to this problem is persuasive evidence that Key developed the '961 capped wheel nut with this problem in mind. The court found Chaivre to be a credible witness. No intervening event occurred, and the postapplication commercial success is relevant.

### E. Conclusions on Nonobviousness

■ The evidence presented by both sides in this matter is inconclusive. It is apparent that many aspects of the '961

---

**3.** At trial, Microdot attempted to elicit evidence that Key's commerical success was an outgrowth of a manufacturing method not in the patent disclosures. The relevance of this evidence was disputed and a separate record was created. In post-trial briefs, Microdot withdrew this argument, and the court, therefore, declines to rule on the admissibility of the separate record.

patent were part of the prior act. However, the court notes that the Patent Office considered all the above-referenced prior art. Under such conditions, some courts have held that the presumption of validity is strengthened. *See, e.g., Darda Toys USA v. Majorette Toys (U.S.),* 627 F.Supp. 1121 (S.D.Fla.1986), *reversed in part on other grounds,* 824 F.2d 976 (Fed.Cir.1987) (Table) (Text in Westlaw). Conversely, courts have held that the party alleging patent invalidity is more likely to carry its burden of persuasion if it provides pertinent prior art not considered by the PTO. *Jervis B. Webb v. Southern Systems,* 742 F.2d 1388 (Fed.Cir.1984); *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542 (Fed.Cir. 1983). Under any circumstances, however, the burden on the party challenging the validity of the patent remains to show obviousness by a clear and convincing evidence. *Atlas Powder,* 750 F.2d at 1573.

The court holds that Microdot has not met its burden. In essence, the '961 patent teaches that by welding a nut body to stainless steel cap on the end, wrenching forces will be applied to the welds in shear, and that the welds will remain intact despite repeated applications of those wrenching forces. Although numerous other aspects of the invention were challenged with strong showings of obviousness, this crucial teaching was not shown to be obvious by clear and convincing evidence.

In addition, there was strong evidence of commercial success. The industry change from crimped capped wheel nuts to welded capped wheel nuts shows the superiority of this latter form. The 100–fold increase in sales of this product shows a strong attraction to the product by consumers. Although Microdot did provide contrary evidence, it did not clearly and convincingly refute the PTO's findings.

III. *Infringement*

■ A person or entity asserting a patent right must prove infringement by a preponderance of the evidence. *Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed.Cir.1983). Infringement may be shown in one of two ways: "[l]iteral infringement" requires a showing that an accused device falls within the scope of the asserted claims as properly interpreted. *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 758 (Fed.Cir.1984). In determining literal infringement, the court must first define the patented invention as indicated by the language of the claims, and then the trier of fact must decide whether the claims cover the accused device. *Envirotech,* 730 F.2d at 758. Literal infringement requires that the accused device "embody every element of the claim." *Builders Concrete v. Bremerton Concrete Products,* 757 F.2d 255, 257 (Fed.Cir.1985). Conformity to insignificant words of the claim, however, is not necessary. *Id.* A claim is construed in light of its language, the other claims, the prior art, the prosecution history, and the specification, not in light of the accused device. *SRI Int'l v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1118 (Fed.Cir.1985) (en banc); *McGill, Inc. v. John Zink Co.,* 736 F.2d 666, 673 (Fed.Cir.1984); *Fromson v. Advance Offset Plate, Inc.,* 720 F.2d 1565, 1569 (Fed.Cir.1983). A claim should be construed as it would be by an individual of ordinary skill in the art. *Id.* at 1574. Only after a claim has been construed should it be applied to the accused device to determine infringement. *SRI Int'l.,* 775 F.2d at 1118.

■ The Microdot capped wheel nuts differs from those of Key. The '961 patent describes a cap face of the nut body that is at right angles to the axis of the nut body. Likewise, the cap has an end which, when placed over the nut body, is at right angles to the axis of the nut body. '961 Reexamined Patent Claims 1,8. The Microdot capped wheel nuts, however, have a tapered cap. When welded together, the Microdot cap is not strictly at right angles with the nut body. Microdot also argues in this connection that there cannot be a "substantial area" of contact which is at right angles to the axis of the nut body.

These differences are of words which have no significance. The taper is almost undetectable and does not effect any important claim. As to "substantial area,"

the court notes that the Microdot nut does contact the cap where they are welded together. This contact is, therefore, around the entire circumference of the cap face of the nut body. If such insignificant differences were to prevent a finding of literal infringement, that doctrine would be meaningless. In view of the insignificance of the differences, the court hold that Microdot literally infringed the patent claims.

■ Even if there were no literal infringements, however, there still may be infringement under the doctrine of "equivalents." Under this theory, a person is held to have infringed on the patent if an accused manufacturer "performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). According to the *Graver* court:

> What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with other ingredients, and the function which it is intended to perform. An important factor in whether persons reasonably skilled in the art would have known of an ingredient not contained in the patent with one that was.

> A finding of equivalence is a determination of fact. Proof can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art. Like any other issue of fact, final determination requires a balancing of credibility, persuasiveness and weight of evidence.

339 U.S. at 609–10, 70 S.Ct. at 856–57.

■ Applying these standards, the court concludes that Microdot infringed the '961 patent under the doctrine of equivalents. Viewing the invention as a whole, Microdot's capped wheel nut "performs substantially the same function in substantially the same way." The stainless steel cap extends over the wrench flats of the nut body to protect the nut body and the axle stud. The cap is attached to the nut body by weld projections or the welding ring, depending on whether one considers the pre–1984 Microdot wheel nut or the wheel nut presently in use. Finally, the weld in on the end so that wrenching forces are in shear in relation to the weld. The Microdot nuts, therefore, infringe the patent in suit under the doctrine of equivalents.

## IV. *Reexamination Patent*

■ The patent in suit was reexamined, with a reexamination certificate issuing on July 22, 1986. The court has concluded that Microdot's capped wheel nuts infringe the reexamined claims. However, an original patent cannot be infringed once a reissue patent has issued, for the original patent is surrendered. *Seattle Box Co. v. Indus. Crating & Packing*, 731 F.2d 818, 827 (Fed.Cir.1984). Congress has established and exception to this rule, giving the original claims continuing effect if the claims of the original and reissued patents are "identical."

> The surrender of the original patent shall take effect upon the issue of the reissued patent, and every reissued patent shall have the same effect and operation in law, on the trial of actions for causes thereafter arising, as if the same had been originally granted in such amended form, but in so far as the claims of the original and reissued patents are identical, such surrender shall not affect any action then pending nor abate any cause of action then existing, and the reissued patent to the extent that its claims are identical with the original patent, shall

constitute a continuation thereof and have effect continuously from the date of the original patent.

35 U.S.C. § 252. *See also*, 35 U.S.C. § 307(b).

In *Seattle Box*, the Federal Circuit sought to define "identical" within the meaning of § 252. The court refrained from characterizing its analysis as dispositive of the meaning of that term, but held that identical "means, *at most*, 'without substantial change.'" The court also implied that a reissued claim that was "a mere clarification of language to make specific what was always implicit or inherent" would remain identical to the original claim. 731 F.2d at 828.

*Seattle Box* involved a packaging device for pipes used to transport oil. In order to prevent damage of these pipes during transport by train, the patented invention contemplated a double-concave spacer block which would surround one half of the circumference of two adjacent pipes, with other spacer blocks used to enclose the remaining half. Rows of pipes secured with these spacer blocks would then be stacked on top of each other. Originally, Claim 1 of the patent application stated that the double-concave spacer block had a "height substantially equal to the thickness of the tier of pipe lengths." During the application prosecution, however, the applicant changed this language to specify that the spacer block had a height only "greater than the diameter of the pipe." Some six months after the issue of the patent, the patentee amended his claims, stating that the second narrower version was due to inadvertence of counsel. The PTO granted the application for amendment, allowing the amended Claim 1 to specify a spacer block of a height *"substantially equal to or* greater than the thickness of the tier of pipe length"* (emphasis indicating change). The appellate court held that this was not a mere clarification, but rather a substantial change.

In *Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970 (Fed.Cir.1986), the court explicitly adopted the *Seattle Box* standards. The *Kaufman* apparatus involved a method for stretch wrapping loads such as boxes stacked on a pallet with a polymer film. Stretching occurs because the film is pulled over two interconnected rollers. The downstream roller rotates faster than the upstream one by virtue of the gears that interconnect them, causing the force which stretches the polymer film. The original claim, however, did not specifically address this difference in rotating speeds. After litigation commenced, a reexamined patent was issued, with the amendments reflecting this difference in rotational speeds.

The court held that the changes in these claims were not "substantive." The amendments merely "clarified" the claims, with the amended language "already present in the specification and in the original claims themselves. Some of the amendments made were unnecessary and redundant with language already in the claim." *Id.* at 977. The court held that the patentee could recover damages for the period before the reexamination certificate.

The Federal Circuit also recently examined the issue of identity in *Slimfold Mfg. Co. v. Kinkead Industries*, 810 F.2d 1113 (Fed.Cir.1987). The court held that "courts have held that it is the scope of the claim that must be identical, not that the identical words must be used." *Id.* at 1115. The court further held that in making this determination "[c]laims are not interpreted in a vacuum, but are part of and are read in light of the specification." *Id.* at 1116. The court concluded that the insertion of the phrase for the purposes of a technical clarification was not a "substantive change."

> The reissue examiner, in requiring an antecedent for the term "collar," was correcting a drafting error that the prior examiner and Ford's patent lawyer could and probably should have spotted when the original patent was examined. "The specification and claims of a patent ... constitute one of the most difficult legal instruments to draw with accuracy."

*Id.* at 1117 (quoting *Topliff v. Topliff*, 145 U.S. 156, 171, 12 S.Ct. 825, 831, 36 L.Ed. 658 (1892)).

 Microdot points to two amendments as mandating a conclusion by this court that the amended claims are not identical to the original claims. The first limits claim 1 and claim 8 to a cap having a "section extending over the polygonal nut sides including a plurality of cap wrench flats respectively associated with and oppositely facing said polygonal nut sides." Examination of original claim 1 shows, however, that this is a mere clarification of language that is already in the claim. Original claim 1 indicates:

a sheet metal cap for the nut having a section extending over the polygonal sides and and [sic] end section adapted to cover the second end of the nut, said end section being connected to the section of the cap which covers the polygonal sides by a section formed full around the perimeter of the cap ...

The additional language of the amendment does not call for anything new, but rather details what is already contemplated by the claims.

Microdot also argues that a second limitation prohibits the court from determining that the claims are substantially identical. Amended claim 1 requires that the "said cap wrench flats and said polygonal nut sides being disposed between said first and second ends of said nut." Similarly, amended claim 8 requires "polygonal sides between said conical end and said laterally extending end." This language does not appear in the original claims.

Again, these descriptions are inherent to the claims and disclosure of the original patent. The figures which are part of the patent disclosure clearly show that the cap wrench flats and the polygonal nut sides extend between the two ends of the nut. Furthermore, any person with ordinary skill in the art would surely understand that the sides of the nut extend between the two ends of the nut.

Microdot's position rests to a large degree on the fact that the amendments were made to distinguish the patent in suit from the prior art, particularly Luce. The argument concludes that if the amendments distinguished Luce, then by definition they

must be substantive. First, Microdot does not provide case law in support of this contention. Second, this position is apparently inconsistent with its arguments in regard to obviousness. In arguing that the patent is obvious, Microdot asserts that the amendments did not distinguish the patent in suit from Luce, and therefore they effectively show nonobviousness. Here they argue that the amendments did distinguish Luce, and therefore the reissued claims are not substantively identical with the original claims. This inconsistency diminishes the credibility of both arguments.

In any case, this court has held that Microdot did not overcome its burden to show by clear and convincing evidence that Luce made the patent in suit obvious. Here the court holds that the amendments were merely clarifications of what was already in the original patent rather than substantive changes to its claims.

## V. *Conclusion*

In summary, the court concludes that the patent is valid. The court also concludes that Microdot infringed the patent under the doctrine of equivalency. Finally, the court concludes that the amended claims and the original claims are identical within the meaning of 35 U.S.C. § 252, and that liability exists for the period prior to the issuance of the Reexamination Certificate.

The parties shall appear for a status conference on September 29, 1987, to determine the future course of this litigation.

IT IS SO ORDERED.