**IMPERIAL CHEMICAL INDUSTRIES, PLC, Plaintiff,**

v.

**DANBURY PHARMACAL, INC., Defendant.**

**Civ. A. 89–575–CMW.**

United States District Court, D. Delaware.

Aug. 2, 1990.

Douglas E. Whitney, Donald F. Parsons, Jr., and Mary B. Graham of Morris, Nichols, Arsht & Tunnell, Wilmington, Del.

(Paul N. Kokulis, Donald J. Bird, Stephen L. Sulzer, Alesia M. Woodworth, and Mark G. Paulson of Cushman, Darby & Cushman, Washington, D.C., of counsel), for plaintiff.

Jeffrey M. Weiner, Wilmington, Del. (Alfred B. Engelberg, Carmel, New York City, of counsel), for defendant.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

Plaintiff Imperial Chemical Industries, PLC ("ICI") brought this patent infringement action against Defendant Danbury Pharmacal, Inc. ("Danbury") on October 19, 1989.[1] The subject patents are United States Patents 3,836,671 (the " '671 patent") issued to ICI on September 17, 1974 and 3,934,032 (the " '032 patent") issued to ICI on January 20, 1976.[2] The '671 patent contains claims to a pharmaceutical composition useful for producing beta-adrenergic blockade (claims 1–4) in which the active ingredient is a certain alkanolamine derivative, and a method for the treatment or prophylaxis of angina pectoris and cardiac arrhythmias in warm-blooded animals by administering the composition (claim 5). The '032 patent has claims directed to a method for the treatment of hypertension in a warm-blooded animal by the administration of a particular alkanolamine derivative (claims 1–2). Danbury has admitted infringement and raised the affirmative defense of invalidity under 35 U.S.C. §§ 102 and 103 with respect to both patents.

Before ICI commenced this suit, Danbury had filed on June 30, 1989, two Abbreviated New Drug Applications ("ANDA's") with the United States Food and Drug Administration ("FDA") pursuant to 21 U.S.C. § 355(j). Danbury filed these ANDA's to obtain FDA approval to market a generic version of a drug encompassed by ICI's

---

1. ICI is a British Corporation having its principal place of business in London, England. Danbury is a Delaware corporation having its principal place of business in Danbury, Connecticut.

2. The claims of the '671 and '032 patents are presented in Appendix I and Appendix II, respectively.

patents.[3] Danbury amended these ANDA's on September 5, 1989, and simultaneously submitted a patent certification under 21 U.S.C. § 355(j)(2)(A)(vii) that the patents are invalid.[4] Danbury's submission of the amended ANDA's and the patent certification constitutes infringement of the '671 and '032 patents under 35 U.S.C. § 271(e)(2)(A). The FDA's approval of Danbury's ANDA's would have been immediate unless ICI had brought suit within forty five days of ICI's notice of the patent certification. 21 U.S.C. § 355(j)(4)(B)(iii). Because ICI filed suit within the forty five day period, the FDA may not permit Danbury to market its generic drug for a period of 30 months from the date of the patent certification notice unless the patents are adjudicated to be invalid before the thirty month period expires. 21 U.S.C. § 355(j)(4)(B)(iii).

Danbury has not engaged and is not presently engaged in any commercial activity relating to the subject patents. Danbury filed a motion for summary judgment on February 9, 1990. Danbury seeks a declaration that the '671 and '032 patents are invalid for obviousness pursuant to 35 U.S.C. § 103.

The Court has jurisdiction over this controversy under 28 U.S.C. §§ 1331, 1338(a). Venue lies in this Court pursuant to 28 U.S.C. § 1400(b).

For the reasons which will be explained herein, the Court denies defendant's motion for summary judgment.

3. The purpose of this procedure was to receive FDA approval to engage in the commercial manufacture, use, or sale of the drug after expiration of ICI's patents.

4. Danbury filed the patent certification to obtain approval to market the drug immediately without regard to the expiration date of the patents.

5. Atenolol is the common name of 1–p–carbamoylmethylphenoxy–3–isopropylamino–2–propanol according to IUPAC nomenclature.

6. The term "b-blocker" as used herein will refer generically to any compound which has this capability.

7. The human body prepares itself to react appropriately during periods of emotional stress or physical exertion. This reaction occurs, in

## I. FACTS

The parties have deluged this Court with admissions, publications, affidavits, and numerous other documents in connection with this motion. The following discussion represents the Court's view of the salient facts of the present controversy.

### A. Background and Development of Atenolol

The '671 and '032 patents contain claims directed to pharmaceutical compositions comprising an admittedly novel and unobvious compound—atenolol, and to methods of use of atenolol.[5] Atenolol is a compound which is capable of producing beta-adrenergic receptor blockade ("b-blockade"), i.e. it is a beta-blocker.[6] B-blockers function to inhibit stimulation caused by adrenaline and noradrenaline so as to reduce the work of the heart.[7] In particular, b-blockers are synthetic compounds having the ability preferentially to occupy beta-adrenergic receptor sites ("b-receptors") located in various tissues throughout the body, and competitively interfere with the occupancy and stimulation of those sites by endogenous, naturally occurring cathecholamines (adrenaline and noradrenaline). This process diminishes or inhibits the body's response to the sympathetic amines adrenaline and noradrenaline, ultimately to reduce the work of the heart.[8]

part, by the release of adrenaline into the blood stream and noradrenaline at nerve endings. These sympathetic amines (adrenaline and noradrenaline) are "received" at receptor sites throughout the body where they stimulate responses. These stress responses are not always desirable if blood flow to the heart is restricted or the heart is weakened by cardiovascular disease. In this situation, it desirable to inhibit the otherwise normal stimulation caused by adrenaline and noradrenaline, thus reducing the work of the heart.

8. B-blockers are competitive inhibitors of the stimulant effects of endogenous cathecholamines (e.g., adrenaline and noradrenaline) and synthetic exogenous stimulants (e.g., isoprenaline) at b-receptors. Competitive inhibition means that complete b-blockade never results because increasing the concentration of the stimulant overcomes the inhibitory effect of the

The fundamental molecular structure of the compounds involved in this case can be represented by the following:

$$R - \langle\text{aryl ring}\rangle - OCH_2 - CH(OH) - CH_2 - NH - CH(CH_3)_2$$

"R" represents one or more substituents which can be attached to the ring structure (aryl ring) of the molecule. Differences in the chemical structure of this molecule, particularly in the R group, can exert a significant influence on the resultant pharmacological properties.

Certain b-blockers demonstrate a preference or selectivity for the b-receptors predominantly located in the cardiac muscle, whereby the b-blocking effects on other muscles (such as muscles in the peripheral vascular or bronchial system) are significantly reduced. This result or effect is referred to as "cardioselectivity". There are various advantages to the use of a cardioselective b-blocker, mainly because they have reduced effects on the blood vessels and other organs.[9] A cardioselective b-blocker is less likely than a non-cardioselective b-blocker, for example, to induce bronchospasm or asthma attacks, and exacerbate the rise in bloodpressure induced by cigarette smoking.[10] Other b-blockers, when occupying a b-receptor, inhibit the effects of adrenaline and noradrenaline, but they also possess some stimulant activity of their own. B-blockers that act in this manner have intrinsic sympathomimetic activity (ISA).

One important prior art b-blocker, actually developed by ICI, was practolol:

$$CH_3 - CO - NH - \langle\text{ring}\rangle - OCH_2 - CH(OH) - CH_2 - NH - CH(CH_3)_2$$

Another important prior art b-blocker was propranolol:

$$OCH_2 - CH(OH) - CH_2 - NH - CH(CH_3)_2$$

It was known near the time of the invention of atenolol that propranolol was non-cardioselective and did not have ISA. Practolol was cardioselective but had ISA.[11] At the time of the invention of atenolol, there was no compound known in the art which was *cardioselective but without ISA*.[12]

b-blocker. Consequently, adrenaline and atenolol compete for occupancy of the b-receptors.

**9.** Cardioselective b-blockers are referred to as "B1–blockers."

**10.** *See* Affidavit of Dr. John Malcolm Cruickshank, PX 20, ¶ 19.

**11.** Research workers at ICI in 1966 learned that practolol had a cardioselective effect—at certain doses practolol had a greater blocking effect on the b-receptors of the heart muscle than on those of certain other muscles. Practolol was also found to have significant ISA. Affidavit of David James LeCount, PX 32, ¶ 25.

**12.** There was a difference of opinion among researchers around 1967 as to whether ISA was an advantageous or desirable property. *See* Affidavit of David James LeCount, PX 32, ¶ 28.

Another important property is membrane stabilizing activity (MSA), which relates to the ability of a compound to prevent certain stimuli from passing across particular membranes. Compounds with MSA have a powerful local

ICI had begun the development of atenolol by conducting research to develop a b-blocker with the following set of properties:

1. Potency equivalent to propranolol at the cardiac b-receptor sites;
2. Cardioselectivity; and
3. No ISA.

Dr. David James Le Count proceeded to direct complex and tedious research in 1967 at ICI. He ultimately synthesized atenolol in early 1968 and submitted it for biological evaluation. This testing indicated that atenolol was effective, cardioselective, and without ISA. The key distinction between atenolol and other known b-blockers was that atenolol had a carbamoylmethyl R group attached to the aryl ring structure:

$$H_2N\text{---}CO\text{---}CH_2\text{---}\langle\text{ring}\rangle\text{---}OCH_2\text{---}CH(OH)\text{---}CH_2\text{---}NH\text{---}CH(CH_3)_2$$

### B. Proceedings Leading to Issuance of ICI's Patents

ICI filed British Patent Application No. 9445 on February 21, 1969. This application disclosed the atenolol series and atenolol specifically. This British application was the original disclosure and basis for priority for each of the inventions claimed in ICI's Patent Nos. 3,663,607 (the "'607 patent"), the '671 patent, and the '032 patent. The PTO accorded each of these patents a priority date of February 21, 1969.

ICI's initial application in the United States Patent and Trademark Office ("PTO") was Serial No. 9451 filed February 6, 1970 (the "'451 application"). The '451 application disclosed and claimed, *inter alia*, compounds in the atenolol series, pharmaceutical compositions containing compounds in the atenolol series, and methods for the treatment or prophylaxis of heart disease and hypertension by the administration of an effective amount of compounds of the atenolol series. The PTO examiner reviewing the '451 application made a restriction requirement between the compound claims *per se* and the pharmaceutical composition and method of use claims.[13] ICI decided to pursue the compound claims in the '451 application. The '451 application eventually issued as the '607 patent on May 16, 1972, and expired on May 16, 1989.[14]

Before the '607 patent issued, ICI filed divisional application Serial No. 233,781 on March 10, 1972 (the "'781 application") including claims directed to the pharmaceutical compositions and methods of use in the '451 application.[15] The PTO examiner in charge of the '781 application issued another restriction requirement and al-

anaesthetic effect. As of the priority date of the patents in suit, there were differing opinions as to the benefits or detriments of MSA in a b-blocker. Cruickshank Affidavit, ¶ 34; Le Count Affidavit, ¶¶ 30–31. Atenolol has no MSA, but the prosecution history of the patents in suit does not indicate that ICI attempted to use this characteristic of atenolol to distinguish from the prior art.

13. Application claims 1–10 were pure compound claims, and claims 11–17 encompassed pharmaceutical compositions and methods of use. The statutory authority for the restriction requirement resides in 35 U.S.C. § 121, which provides in pertinent part that "[i]f two or more independent and distinct inventions are claimed in one application, the Commissioner may require the application to be restricted to one of the inventions." The PTO Examiner's restriction requirement in the '451 application is a common PTO practice. A restriction requirement forces an applicant to elect or choose claims to have examined at present. The non-elected claims are not examined unless an applicant files another application for them or the Examiner withdraws the restriction requirement. This other later filed application is referred to as a divisional application.

14. The '607 patent *is not involved in this lawsuit.*

15. The '781 application was also a continuation-in-part application because it contained additional disclosure not contained in the '451 application. This additional subject matter is not directly claimed in the '671 or '032 patents, and defendant has made no comments about it. Thus, at least for purposes of this motion, the added subject matter is deemed irrelevant.

lowed only a single method of use to be claimed together with the pharmaceutical compositions. The '781 application issued on September 17, 1974 as the '671 patent. ICI filed another divisional application directed to a method of treating hypertension, application serial no. 461,262 (the "'262 application"). The '262 application issued on January 20, 1976 as the '032 patent. A complete diagram of this network of applications and corresponding patents is shown in Appendix III.

During prosecution of the '781 application leading to issuance of the '671 patent, the PTO examiner initially rejected the claims under section 103 as being obvious over prior patents of Howe teaching practolol and other compounds which had the nitrogen of the group (–CO–NH–) bonded directly to the aryl ring.[16] In its response, ICI contended that the insertion of the group RNHCO–CH₂ in place of the group RCONH would not have been an obvious modification. ICI pointed to differences in the properties between the two compounds, and the PTO examiner later withdrew the rejection.[17]

ICI sought and eventually obtained FDA approval in 1981 to introduce atenolol into the market for use in the treatment of hypertension, and FDA approval in 1985 for atenolol's use in the treatment or prophylaxis of angina. ICI marketed its atenolol formulations under the brand name TENORMIN.[18]

## II. SUMMARY JUDGMENT STANDARD

Summary judgment under F.R.C.P. 56(c) is proper if "there is no genuine issue of material fact and ... the moving party is entitled to judgment as a matter of law." In deciding a motion for summary judgment, a court "must view all facts, and any reasonable inference from those facts, in the light most favorable to the party opposing summary judgment." *Wilmington*

*Housing Authority v. Pan Builders, Inc.*, 665 F.Supp. 351, 353 (D.Del.1987) (citing *Adickes v. Kress Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)). The inquiry is restricted to ascertaining whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If the record as a whole could not lead a rational trier of fact to find for the nonmovant, no genuine issue for trial exists. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

Summary judgment is as proper in a patent case as any other case, if the conditions of Rule 56 have been satisfied. *See Chemical Engineering Corp. v. Essef Industries*, 795 F.2d 1565, 1571 (Fed.Cir. 1986); *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 835 (Fed.Cir.1984). *See also Porter v. Farmers Supply Service, Inc.*, 617 F.Supp. 1175, 1179 (D.Del.1985), *aff'd*, 790 F.2d 882 (Fed.Cir.1986).

## III. DISCUSSION

### A. Burden of Proof

■ It is important to establish precisely the governing burdens of proof in this proceeding. The *ex parte* process of examination by the U.S. Patent and Trademark Office has long since been over. The parties now have a live controversy pertaining to the '671 and '032 patents in a federal district court. Accordingly, the claims of the '671 and '032 patents are presumed valid. 35 U.S.C. § 282.

■ The statutory presumption of validity requires defendant to bear the burden of proving the invalidity of the '671 and '032 patents. 35 U.S.C. § 282.[19] De-

---

**16.** The PTO examiner did not reject any of the claims of the '451 application leading to the '607 patent in view of the prior art.

**17.** In the prosecution of the '262 application leading to issuance of the '032 patent, the PTO examiner initially rejected all claims as obvious over Howe's practolol patent. ICI successfully overcame this rejection.

**18.** TENORMIN is a registered mark.

**19.** This provision further requires that defendant prove invalidity with respect to each claim of the patents in suit.

fendant must demonstrate invalidity by clear and convincing evidence. *See, e.g., Ralston Purina Co. v. Far–Mar–Co.,* 772 F.2d 1570, 1574 (Fed.Cir.1985); *Pennwalt Corp. v. Akzona Inc.,* 740 F.2d 1573, 1578 (Fed.Cir.1984).[20] This presumption of validity is never weakened, *ACS Hospital Systems, Inc. v. Montefiore Hospital,* 732 F.2d 1572, 1574–75 (Fed.Cir.1984), and the burden of proving invalidity does not shift from the party asserting invalidity, *American Hoist & Derrick Co. v. Sowa & Sons, Inc.,* 725 F.2d 1350, 1360 (Fed.Cir.), *cert. denied,* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). The burden of going forward with evidence rebutting invalidity may shift to the patentee only after the party asserting invalidity has demonstrated a legally sufficient prima facie case of invalidity. *Ashland Oil, Inc. v. Delta Resins & Refractories Inc.,* 776 F.2d 281, 291 (Fed.Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986); *Ralston Purina,* 772 F.2d at 1573; *Rohm and Haas Co. v. Mobil Oil Corp.,* 718 F.Supp. 274, 313 (D.Del.1989), *aff'd,* 895 F.2d 1421 (Fed.Cir.1990).[21] If defendant has established a legally sufficient case of invalidity, a court then examines all of the evidence of invalidity together with all of the evidence rebutting invalidity, and determines whether there is clear and convincing evidence of invalidity. *Ashland Oil,* 776 F.2d at 291–92.

### B. Obviousness: 35 U.S.C. § 103

■ The Court has thoroughly reviewed the voluminous record in this case. The Court concludes that defendant has failed to establish a legally sufficient prima facie case of invalidity under section 103. In the alternative, assuming defendant has presented a legally sufficient prima facie case of invalidity under section 103, plaintiff has responded with sufficient rebuttal evidence to raise a genuine issue of material fact as to the issue of validity.

Defendant's attack on the validity of the '671 and '032 patents is grounded upon 35 U.S.C. § 103, which provides the following in pertinent part:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103. Obviousness is ultimately a question of law. *Panduit Corp. v. Dennison Manufacturing Co.,* 810 F.2d 1561, 1566–68 (Fed.Cir.), *cert. denied,* 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987).

The analysis of an obviousness question is axiomatic since the decision of the United States Supreme Court in *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). This analysis has evolved into a four part factual inquiry which examines the following:

1. The scope and content of the prior art;

2. The differences between the claims and the prior art;

3. The level of ordinary skill in the pertinent art; and

4. Secondary considerations, which include objective evidence of nonobviousness such as long-felt but unsolved need,

---

**20.** "Fewer precepts have been made more clearer by the Federal Circuit than that a patent is presumed valid and a party asserting its invalidity in this Court bears and retains the burden of proving invalidity by clear and convincing evidence." *Rohm and Haas Co. v. Mobil Oil Corp.,* 718 F.Supp. 274, 312–13 (D.Del.1989), *aff'd,* 895 F.2d 1421 (Fed.Cir.1990).

**21.** *See also In re Etter,* 756 F.2d 852, 861 (Fed. Cir.), *cert. denied,* 474 U.S. 828, 106 S.Ct. 88, 88 L.Ed.2d 72 (1985). ("The presumption of validity places on the challenger of a patent the burden of coming forward with evidence to establish facts which may lead to the conclusion that the patent is invalid"). Danbury's briefing has focused on the "structural obviousness" of atenolol. Danbury's burden, however, is not one of establishing a prima facie case of structural obviousness. Rather, Danbury must present a legally sufficient prima facie case of obviousness based upon the totality of the factual inquires mandated by *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), and its progeny. Structural similarity between the patented invention and the prior art is but one factor in the analysis.

failure of others, and commercial success.

*Graham*, 383 U.S. at 17–18, 86 S.Ct. at 693–94, *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1050 (Fed.Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988); *Panduit Corp. v. Dennison Manufacturing Co.*, 810 F.2d 1561, 1566–68 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). The Court will proceed with an evaluation of each of these factors.

### 1. The Scope and Content of the Prior Art

To formulate the state of the prior art at the time the inventions of the subject patents were made, Danbury has relied upon statements made during prosecution of the '671 and '032 patents, publications, and various admissions ICI has made during discovery in this case. The Court has studied these papers and notes that the following undisputed facts can be gleaned from them:

1. During prosecution of the applications leading to issuance of the '671 patent, ICI indicated that there were many known compounds having b-adrenergic blockade activity, and that many of the "known compounds" were 3–amino–1–aryloxy–2–propanol derivatives. Specific examples of these known compounds included propranolol, alprenolol, oxprenolol, and toliprolol.

2. One known disadvantage of propranolol, alprenolol, and related compounds was their blocking of the action of isoprenaline on peripheral b-receptors. These compounds also could not be used for the treatment of asthmatic patients with heart disease.[22]

3. Incorporation of an amido substituent into the aryloxy nucleus of a 1–aryloxy–3–amino–2–propanol derivative resulted in a compound which possessed "cardioselective" b-blocking activity.

4. Practolol was the only cardioselective b-blockade agent commercially available at the time of the invention of atenolol.

5. Some b-blockade agents had a certain amount of ISA.

6. Of the commercially available non-cardioselective b-blockers, alprenolol and oxprenolol both possessed significant ISA, whereas propanolol and toliprolol both had little ISA.

7. Practolol, the commercially available cardioselective b-blocker, possessed significant ISA.

8. As of the priority date of the applications leading to issuance of the '671 and '032 patents, *no cardioselective b-blocker was known which was devoid of ISA.*[23]

9. Propranolol was a non-cardioselective b-blocker lacking ISA in clinical use before February, 1969.[24]

10. Practolol was a cardioselective b-blocking agent having ISA in clinical use before February, 1969.[25]

11. There were statements in the art prior to February, 1969 that alprenolol, oxprenolol, propranolol, and practolol had possible usefulness in the treatment of hypertension. There were also statements in the art at the same time concluding that there was insufficient data to make a determination as to whether these compounds would be effective in such treatment.[26]

12. Alprenolol, oxprenolol, and propranolol were known in the art prior to February, 1969, to be useful in the treatment of angina pectoris. Practolol was still under investigation at the time.[27]

---

**22.** Isoprenaline was a synthetic analogue of the endogenous catecholamines adrenaline and noradrenaline.

**23.** Undisputed facts 1–8 are derived from statements that ICI made during prosecution of the '781 application leading to issuance of the '671 patent. PX 5, DX 3.

**24.** DX 4, Plaintiff's Response to Admission Request No. 27.

**25.** DX 4, Plaintiff's Response to Admission Request No. 28.

**26.** DX 4, Plaintiff's Response to Admission Request No. 29.

**27.** DX 4, Plaintiff's Response to Admission Request No. 30.

13. During prosecution of the application leading to issuance of the '671 patent, ICI stated that "those skilled in the art regard the treatment *inter alia* of angina pectoris, cardiac arrhythmias and hypertension as standard clinical uses of b-adrenergic blocking agents." [28]

14. Atenolol is an isomer of practolol in that both compounds have the same empirical formula: $C_{14}H_{22}N_2O_3$. The only difference in structure between atenolol and practolol is that the R substituent group attached to the aryl ring is carbamoylmethyl for atenolol, and acetamido for practolol.

15. In a 1968 publication, ICI discussed propranolol, alprenolol, toliprolol, and other b-blockers. This publication contains the statement that "[s]tructurally these compounds are closely related to each other and may be considered as derivatives of isoprenaline...." [29]

16. ICI had several patents which are prior art to the patents in suit. These patents collectively teach compounds having b-blockade activity. [30]

In summary, these facts indicate that as of February 1969, many compounds were known to have b-blockade activity; these compounds generally were 3–amino–1–aryloxy–2–propanol derivatives. The prior art also suggested that certain compounds having b-blockade activity would be useful in the treatment of hypertension and angina pectoris. The prior art, however, did not show any b-blockade compounds having a carbamoylmethyl group as the R substituent attached to the aryl ring. [31]

### 2. Differences Between The Claims and The Prior Art

Initially, the Court notes that defendant has admitted, for purposes of the present summary judgment motion, that atenolol was patentable as a chemical compound per se. [32] This means that atenolol itself was novel and unobvious over any available prior art. [33] Danbury has largely ignored the consequences of this admission, but the Court views this admission as a virtual death knell to the summary judgment motion. [34]

Danbury first seizes upon the supposed "very close structural relationship" be-

---

**28.** DX 3, PX 5.

**29.** DX 6.

**30.** DX 9–16. There are eight of these patents, but ICI has noted that one of them, U.S. Patent 3,873,618 (DX 16) is not in fact prior art to the patents in suit.

**31.** In essence, the additional prior art that Danbury has cited in connection with this motion appears no more pertinent than that which was available to the PTO during examination of the applications.

**32.** The '607 patent encompassing atenolol per se has expired and is not the subject of this lawsuit.

**33.** Claim 2 of the '671 patent is directed to a pharmaceutical composition containing atenolol as the active ingredient. Thus, Danbury's admission as to the novelty and nonobviousness of atenolol automatically precludes any possibility that this composition claim is invalid at this summary judgment stage. *See In re May*, 574 F.2d 1082, 1093 n. 10 (C.C.P.A.1978) ("Since the only active ingredient in the composition claims is the compound, we will treat these claims as if they were compound claims").

Plaintiff has requested the Court to decide that Claim 2 of the '671 patent is valid as a matter of law. The Court will not go so far at this point. Danbury pointed out that its admission as to the novelty and nonobviousness of atenolol was limited to the context of the summary judgment motion, and therefore the Court will not extend its effect any further.

**34.** Danbury attempts to qualify this admission by noting that "the argument presented by ICI with respect to unexpected properties was sufficient to overcome the *prima facie* obviousness of atenolol based on its chemical structure." Defendant's Opening Brief at 18. This statement obviously assumes that the Examiner had presented a satisfactory prima facie case of obviousness of atenolol based upon structural considerations, or that ICI conceded this point. The Court, however, does not regard the prosecution history of any of the relevant applications as indicating that ICI conceded that its claimed compounds were *prima facie* obvious. Furthermore, Danbury does not challenge ICI's statement that "[a]t no time during the prosecution of the applications leading to the '607 patent, the '671 patent, or the '032 Patents in suit, did ICI admit or acknowledge that atenolol (or any other compound in the atenolol series) was structurally or prima facie obvious." *See* ICI Fact Statement ¶ 86.

tween atenolol and practolol.[35] In particular, Danbury cites *In re Grabiak*, 769 F.2d 729, 731 (Fed.Cir.1985), *In re May*, 574 F.2d 1082 (C.C.P.A.1978), and *In re Wilder*, 563 F.2d 457, 458 (C.C.P.A.1977) for the proposition that "[i]f the claimed compound or composition is an isomer of a prior art compound a 'very close' structural similarity sufficient to support a finding of *prima facie* obviousness is established ... That structural relationship, standing alone, is sufficient, as a matter of law, to meet the two-prong test for *prima facie* obviousness." Defendant's Opening Brief ("D.O. B.") at 14.[36] In the Court's view, Danbury has oversimplified and overgeneralized the import of these cases.

The Court does not read *Grabiak, May,* and *Wilder* nearly as broadly as Danbury. In *Grabiak*, the Federal Circuit held that "[w]hen chemical compounds have 'very close' structural similarities and similar utilities, without more a *prima facie* case may be made." *Grabiak*, 769 F.2d at 731.[37] The Federal Circuit emphasized, however, that "there must be adequate support in the prior art for the ... change in structure, in order to complete the PTO's *prima facie* case and shift the burden of going forward to the applicant." *Id.* at 731–32. The Federal Circuit reversed a rejection by the Examiner and upheld by the PTO Board of Appeals because the cited references did not support the contention that the modification in issue would have been *prima facie* obvious. *Id.* at 732.

In *Wilder*, the claimed compounds and the prior art compounds essentially shared the same core molecule, but as in the present case, the difference resided in the "R" group substituent. The claimed compound was the next adjacent homologue of one of the prior art compounds, i.e. the claimed compound had one additional $CH_2$ group than the prior art compound. The other prior art compound was an isomer of the claimed compound because the R group in both compounds had an empirical formula of $C_7H_{15}$. The R group was also connected to the core molecule by a carbon atom in both the claimed compound and the prior art isomer. The claimed compound had five carbon atoms in a chain with two branched in the R group, whereas the prior art isomeric compound had six carbons in a chain with one branched in the R group. The C.C.P.A. found that there was a "close structural relationship" between the claimed compound and the prior art homologue, and between the claimed compound and the prior art isomer. *See Wilder*, 563 F.2d at 458 n. 7 and 460–61.

In the present case, the R group of atenolol and practolol is attached to the base molecule via different atoms, carbon in the case of atenolol and nitrogen in the case of practolol; the R groups are substantively different, acetamido in the case of practolol and carbamoylmethyl in the case of atenolol. Thus, the instant case is not a situation in which the compound of the invention is a "branched isomer" of the prior art as

**35.** Danbury's argument contains the implicit assertion that practolol is the "closest prior art" compound to atenolol. ICI has not admitted nor controverted this point. The Court's review of the record in this case suggests that from a structural standpoint, practolol is the closest prior art to atenolol. The Court will proceed on this premise, but the parties are free at trial to introduce evidence on the issue of the "closest prior art."

**36.** Danbury has also cited *In re Dillon*, 892 F.2d 1554 (Fed.Cir.1989) as the governing standard for establishing a prima facie case of obviousness. The Federal Circuit has recently vacated the judgment and ordered a rehearing en banc in *Dillon*. Defendant has contended that "[t]he controversy which gives rise to the withdrawal of the *Dillon* decision by the Federal Circuit pending *in banc* reconsideration has nothing to

do with either legal proposition for which *Dillon* was cited by Danbury as cumulative support." Defendant's Letter to the Court dated June 1, 1990. Because the Federal Circuit has vacated the judgment in *Dillon* and ordered a rehearing, this Court will not consider *Dillon* in any way.

**37.** The Federal Circuit commented that "[a]nalysis of those circumstances in which a *prima facie* case has or has not been made in view of the degree of structural similarity or dissimilarity, or the presence or absence of similar utility between the prior art compound and that of the applicant, has inspired generations of applicants, courts, and scholars. Upon review of this history, we have concluded that generalization should be avoided insofar as specific chemical structures are alleged to be *prima facie* obvious one from the other." *Grabiak*, 769 F.2d at 731.

was the situation in *Wilder*.[38] These distinctions negate an inference of close structural similarity, particularly where the prior art does not teach or suggest an equivalency or interchangeability between acetamido and carbamoylmethyl.[39]

*In re May* addressed the patentability of methods of use and compositions containing an optical isomer of a known racemate. The applicants had conceded that the claimed compounds and their use would have been prima facie obvious. *In re May*, 574 F.2d at 1089. The C.C.P.A., however, held that applicants successfully rebutted this prima facie case of obviousness with respect to certain of the method of use and composition claims. *Id.* at 1093–95. In the present case, atenolol is not the optical isomer of practolol. Atenolol has a different R group attached to the aryl ring.

This trilogy of cases does not stand for the proposition that two compounds merely having the same empirical formula *ipso facto* have a "close structural similarity", giving rise to an immediate prima facie case of structural obviousness.[40] The Court does not understand this notion to be an accurate statement of the law.[41] Dan-

bury has not produced any evidence which would suggest the desirability or equivalency of replacing the acetamido group of practolol with a carbamoylmethyl group to obtain an effective b-blocker.[42] Absent this showing, there is no permissible inference of a close structural similarity between atenolol and practolol.[43]

The decision of the Federal Circuit in *In re Merck & Co.*, 800 F.2d 1091 (Fed.Cir. 1986) is particularly instructive. In *Merck*, an applicant sought to obtain a claim to a method of use of a *known compound* (amitriptyline) to treat depression. The prior art taught that amitriptyline had effects on the central nervous system, but the prior art knowledge did not explicitly appreciate that amitriptyline could treat depression. Another prior art reference taught that a similar compound (imipramine) was an effective antidepressant.[44] The court held that a showing of obviousness required a determination from the prior art that one skilled in the art would have expected amitriptyline, like imipramine, to be useful as an antidepressant. *Id.* at 1096. The PTO Board of Appeals had cited prior art which recognized that amitriptyline was expected

---

**38.** In addition, atenolol is not the next adjacent homologue of practolol.

**39.** It would be overstepping to conclude that there is a close structural similarity between atenolol and practolol *as a matter of law. See* Part III–C–1, *infra*.

**40.** As the Court stressed earlier, this is but one part of the four pronged factual inquiry of *Graham v. John Deere.* Even if Danbury may establish a close structural similarity, this alone does not shift the burden to ICI, as would occur in the *ex parte* examination process.

**41.** Defendant further contends that additional evidence of structural similarity is present. Specifically, Danbury makes references to (1) ICI's statements that b-blockers were closely related to each other, and (2) ICI's prior patents directed to b-blocker compounds. Defendant then relies upon *In re Payne*, 606 F.2d 303, 314 (C.C.P.A.1979) to argue that atenolol was "bracketed" by the known prior art b-blockers. There is no bracketing of atenolol by the known prior art as that term was used in *Payne. See Payne*, 606 F.2d at 314 (describing differences between claimed compounds and prior art, and articulating bracketing concept).

**42.** The Federal Circuit has suggested that in certain circumstances " '[s]tructural similarity,

alone, may be sufficient to give rise to an expectation that compounds similar in structure will have similar properties' ". *In re Merck & Co.*, 800 F.2d 1091, 1096 (Fed.Cir.1986) (citing *In re Payne*, 606 F.2d 303, 313 (C.C.P.A.1979)). The present case, however, is not one in which such a conclusion is appropriate.

**43.** *See In re Lalu*, 747 F.2d 703, 705 (Fed.Cir. 1984) ("In determining whether a case of prima facie obviousness exists, it is necessary to ascertain whether the prior art teachings would appear to be sufficient to one of ordinary skill in the art to suggest making the claimed substitution or other modification ... The prior art must provide one of ordinary skill in the art the motivation to make the proposed molecular modifications needed to arrive at the claimed compound"). *See also* D. Chisum, *Patents* § 5.04[6]–324 ("[i]n more recent cases, the court has taken the position that 'structural similarity' turns on 'whether the prior art teachings would appear to be sufficient to one of ordinary skill in the art to suggest making the proposed substitution to other modification' ").

**44.** Imipramine differed from amitriptyline only in the replacement of an unsaturated carbon in a ring structure with a nitrogen atom.

to resemble imipramine clinically in its depression alleviation effects. *Id.*[45] The court found a prima facie case of obviousness:

> Clearly, amitriptyline and imipramine, both known psychotropic drugs, are closely structurally related. The expectation that the similar structures would behave similarly was suggested in the Roche Reports. In combination with those teachings, the prior art teaching the precise structural difference between amitriptyline and imipramine involves a known bioisosteric replacement provides sufficient basis for the required expectation of success, without resort to hindsight.

*Id.* at 1097.[46]

In the present case, the claims at issue are one step removed from the facts in *Merck*—the claims in issue involve an admitted novel and unobvious compound. Although atenolol may be within the broad class of 1–aryloxy–3–amino–2–propanol derivatives, there must be a suggestion or expectation from the prior art that substitution of a carbamoylmethyl group in place of the acetamido group of practolol would result in a b-blocker useful in the treatment of angina pectoris, hypertension, and cardiac arrhythmias. Defendant has not pro-

duced satisfactory evidence in this respect. The prior art may have suggested that *known* b-blockers would have certain uses and specific properties, but atenolol admittedly was not a known b-blocker. The fact that the prior art taught that a broad class of compounds would have b-blockade activity is not sufficient to equal the quality of the evidence compelling a conclusion of obviousness in *Merck.*[47]

Danbury must also establish the lack of unexpected or superior results associated with the inventions of the subject patents. *American Hospital Supply Corp. v. Travenol Laboratories,* 745 F.2d 1, 8 (Fed.Cir. 1984); *Gillette Co. v. S.C. Johnson & Son Inc.,* 12 U.S.P.Q.2d 1929, 1960, 1989 WL 87374 (D.Mass.1989).[48] Danbury admits that the properties of atenolol (cardioselectivity without ISA) were sufficient to establish the patentability of atenolol as a compound. Danbury, however, regards this admission as largely irrelevant by asserting that the unexpected properties possessed by atenolol did not alter atenolol's expected uses.[49] This reasoning is tenuous.

It is now a well established principle in patent law that unexpected or superior results are always relevant in evaluating pat-

---

**45.** The prior art also taught the interchange of the nitrogen and carbon atoms. *Merck,* 800 F.2d at 1096–97.

**46.** The so-called Roche reports were particularly relevant in that they reported the results from tests comparing the pharmacological properties of amitriptyline and imipramine. The reports noted that the two compounds were very similar in many properties. The structural similarity and the overlap in properties lead Roche scientists to conclude that amitriptyline warranted evaluation for depression alleviation. *Merck,* 800 F.2d at 1095.

**47.** The weakness in defendant's position is exemplified by the argument that "atenolol would have been expected to be useful as a beta blocker because it fits within the general formula of compounds which were known to be useful as beta blockers." D.O.B. at 20. If atenolol is an admitted novel and unobvious compound, then *by definition* it did not fit within the class of compounds known to be useful as beta blockers.

**48.** In *American Hospital Supply Co.,* the Federal Circuit was reviewing a decision by the United States International Trade Commission ("ITC")

finding a patent invalid under § 103. This distinction, however, is of no moment as the court emphasized that the party asserting invalidity must show the lack of unexpected results. *American Hospital Supply Co.,* 745 F.2d at 8. *Gillette Co.* is more on point as it involved a district court proceeding:

> In the instant case, the patent has been granted. Johnson [patentee] does not have any burden of proving superior results. The burden is on Gillette [defendant] to prove by clear and convincing evidence that the invention does not produce superior results. *Gillette,* 12 U.S.P.Q.2d at 1960.

**49.** Defendant contends that "[t]hose skilled in the art would have expected atenolol to be useful in treating hypertension because atenolol is an isomer of practolol, a known beta blocker which was disclosed in the prior art as being useful to treat hypertension." D.O.B. at 19–20. The Court has already rejected defendant's arguments based upon the isomeric relationship between atenolol and practolol.

entability.[50] Danbury suggests that any unexpected results achieved by atenolol were consumed by allowance of compound claims encompassing atenolol. In an analogous situation in which claims for the use of a compound as an antidiabetic agent had been allowed on the basis of unexpected results, but the PTO refused to allow a later claim directed to the compound per se, the C.C.P.A. rejected the notion unexpected results had no bearing on the compound claims. *In re McLamore*, 379 F.2d 985, 989 (C.C.P.A.1967).[51] The rationale in *McLamore* applies with equal force in this case. Danbury must present a quantum of evidence to support an inference that the claimed methods and compositions do not have superior or unexpected results over the prior art, and this Danbury has not done.

Defendant has relied upon *In re Kuehl,* 475 F.2d 658 (C.C.P.A.1973), in contending that the novelty or nonobviousness of the compound (atenolol) or composition does not automatically establish patentability of the method-of-use claims.[52] The reasoning in *Kuehl* has no applicability to this case. ICI has no burden of establishing the patentability of the claims in issue.

The C.C.P.A. in *Kuehl* actually found a method patentable because the patentable catalyst was not similar (not an isomer, homologue, or analogue of the prior art) to known catalysts used in hydrocarbon cracking. *Id.* at 663. Danbury, therefore, asserts that the facts that were missing in

*Kuehl* are present in this case. The Court has already rejected Danbury's contention that there is a permissible inference of a close structural relationship between atenolol and the prior art. The missing elements are not present in this case as well.[53]

*3. Level of Ordinary Skill in the Art*

The relevant factors in establishing the level of ordinary skill in the art include the following:

1. The educational level of the inventor;
2. The type of problems encountered in the art;
3. Prior art solutions to those problems;
4. Rapidity with which inventions are made;
5. Sophistication of the technology; and
6. Educational level of active workers in the field.

*Custom Accessories v. Jeffrey–Allen Industries,* 807 F.2d 955, 962 (Fed.Cir.1986); *Environmental Designs, Ltd. v. Union Oil Company of California,* 713 F.2d 693, 696 (Fed.Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 709, 79 L.Ed.2d 173 (1984). All of these factors may not be present in every case and one or more of these factors may predominate in a particular case. *Custom Accessories,* 807 F.2d at 962–63; *Environmental Designs,* 713 F.2d at 696–97. In certain situations, such as simple and easily understandable technology, a specific finding on the level of ordinary skill in the art is unnecessary because the

---

**50.** *See, e.g., In re Chupp,* 816 F.2d 643 (Fed.Cir. 1987); *In re Merck,* 800 F.2d 1091, 1098 (Fed. Cir.1986). Danbury comments that "there is nothing in logic or law which supports the legal conclusion that the discovery of an unexpected property, even if sufficient to overcome a *prima facie* case of obviousness with respect to the composition claims, automatically establishes the patentability of claims covering the uses of that composition." D.O.B. at 18–19. This statement may be correct, but Danbury mischaracterizes the nature of this district court proceeding. ICI is under *no burden* to demonstrate the patentability of its claims—Danbury must prove invalidity and this includes a showing that the claimed methods do not produce unexpected or superior results.

**51.** The court stated that "[t]he Patent Office is not on sound ground in saying to appellant: We

are refusing you this claim *because* we have allowed you other claims and in doing so listened to and accepted your arguments, wherefore we will not listen to them again." *Id.* at 989 (emphasis original).

**52.** The C.C.P.A. rejected the broad proposition that the allowance of composition claims necessarily entitled an applicant to claims in the same application directed to a method of using a substance the PTO found to be a new and unobvious composition of matter. *In re Kuehl,* 475 F.2d at 661–62.

**53.** Danbury's reliance on *In re Durden,* 763 F.2d 1406 (Fed.Cir.1985), is equally unavailing. *Durden* addressed the patentability of a process of producing a patented compound. The claims in the '671 and '032 patents are not "processes" as that term is used in the *Durden* decision.

prior art itself reflects the level of ordinary skill. *Chore–Time Equipment v. Cumberland Corp.*, 713 F.2d 774, 779 (Fed.Cir. 1983).

ICI argues that Danbury's failure to present evidence on the level of ordinary skill in the art is fatal to the summary judgment motion. Danbury, however, contends that such a finding is not necessary because the prior art itself is representative of the level of ordinary skill. It is apparent that this is not a case in which it is appropriate to avoid making a finding on the level of ordinary skill in the art. This case deals with complex pharmaceutical chemistry and not simple technology which even a layman would comprehend. The hypothetical person of ordinary skill in the pertinent art is likely to have had several years of scientific education and medical or pharmaceutical training. The art does not readily "speak for itself." Furthermore, the Court does not understand any case law to hold that "the level of skill in the art is such that structural similarity gives rise to an expectation that compounds similar in structure will have similar properties." D.R.B. at 16.[54]

A failure to demonstrate the level of ordinary skill in the art may not necessarily preclude a summary judgment of invalidity. In the context of the present case, however, the absence of evidence on this issue is a factor weighing against a showing of obviousness.

In conclusion, upon review of the relevant factors set forth in *Graham v. John Deere Co.*, the Court holds that Defendant Danbury has failed to present a legally sufficient prima facie case of obviousness under section 103 of any of the claims of the '671 and '032 patents.

## C. Plaintiff's Rebuttal Evidence

### 1. Genuine Issues of Material Fact

■ The Court has held above that defendant has not presented a prima facie case of obviousness of any of the claims of the patents in suit. If, however, the Court assumes that defendant has done so, it is clear that ICI has submitted sufficient rebuttal evidence to raise a genuine issue of material fact as to the validity of the patents in suit. The genuine factual issues which must be tried include, but are not limited to, the following:

1. The level of ordinary skill in the pertinent art;

2. The importance of the R group substituent and the effect that variation of this substituent had on the b-blockade capability of known b-blockers.

3. Whether the scope of available knowledge would have provided the requisite motivation to one of ordinary skill in the art to replace the acetamido R substituent of practolol with a carbamoylmethyl substituent, with the expectation of deriving a b-blocker that could be useful in a method for the treatment of angina pectoris, hypertension, and cardiac arrhythmias.[55]

4. Whether the claimed methods and compositions exhibited superior or unexpected results over the available prior art b-blockers.[56]

5. The existence or non-existence of advantages of the claimed methods and compositions.

The inquiries detailed above are matters that must come before a factfinder because there are genuine factual disputes at this stage. These genuine factual disputes remove any possibility that Danbury has met

---

**54.** Likewise, the level of ordinary skill in the art is not necessarily "defined by the multitude of cases which hold that isomers are sufficiently close in structure to give rise to a reasonable expectation of similar properties." D.R.B. at 17. The Court points out that in *Environmental Designs v. Union Oil Co.*, 713 F.2d at 697, the Federal Circuit did not find reversible error where the trial judge did not specify a particular level of skill in the art. The Federal Circuit, however, ruled that a finding on the level of skill was unnecessary because "the parties are in agreement that their respective chemical expert witnesses with extensive backgrounds in sulfur chemistry are persons of ordinary skill in the art." *Id.*

**55.** *See, e.g.,* Affidavit of Dr. Charles W. Rees, PX 18, ¶¶ 12–20; Affidavit of David James Le Count, PX 32, ¶ 57.

**56.** *See, e.g.,* Affidavit of Dr. John Malcolm Cruickshank, ¶¶ 13, 29.

its burden of proving the invalidity of the patents in suit by clear and convincing evidence.

## 2. Objective Indicia of Non-obviousness

■ These objective criteria, or secondary considerations, include such factors as commercial success, failure of others, long felt need, and skepticism of experts. *Panduit*, 810 F.2d at 1569. These factors must always be considered. *Ashland Oil, Inc. v. Delta Resins & Refractories*, 776 F.2d 281, 306 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538–39 (Fed.Cir.1983). Secondary considerations are worthy of substantial weight only when there is a nexus established between the merits of the claimed invention and the evidence proffered on secondary considerations. *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed.Cir.), *cert. denied*, 488 U.S. 956, 109 S.Ct. 395, 102 L.Ed.2d 383 (1988).

In *Demaco Corp.*, the Federal Circuit set forth the appropriate procedural analysis of the nexus requirement:

1. The burden of proof as to the nexus resides with the patentee. Thus, the patentee initially must come forward with evidence sufficient to constitute a prima facie case of the requisite nexus.[57]

2. If the patentee has presented a prima facie case of nexus, the burden of coming forward with evidence in rebuttal shifts to the party challenging the validity of the patent.[58]

3. If a prima facie case of nexus is made, a court must consider evidence introduced on both sides of the question. When a defendant has not fully rebutted a prima facie case of a nexus, the district court may not totally ignore the objective evidence.

*Demaco Corp.*, 851 F.2d at 1394.

■ ICI has presented enough evidence to make out a prima facie case of the requisite nexus by the information in the affidavit of Robert C. Black, Vice President of ICI Americas Inc. ("ICIA") and Vice President, Sales and Marketing, of the ICI Pharmaceuticals Group.[59] This affidavit shows that TENORMIN's total sales and share of the market have steadily increased since 1981 both with respect to b-blockers approved for use in the treatment of hypertension and angina. This evidence is sufficient to establish a prima facie case of the requisite nexus between this commercial success and the inventions of claim 5 of the '671 patent and claims 1 and 2 of the '032 patent.

Danbury places itself in a quagmire by admitting that "atenolol has been an outstanding commercial success." D.O.B. at 27. Danbury attempts to retreat from this precarious position by arguing that "as a matter of simple logic, the commercial success of atenolol is due to its perceived superiority *over the known beta blockers* for the same end uses as those beta blockers. Since the uses are the same the commercial success of atenolol must be due to the properties of atenolol." D.O.B. at 27. Danbury does not present *evidence* on how this perception originated, and this simple argument falls short of rebutting ICI's prima facie showing of a nexus between the patented invention and the commercial success of TENORMIN.

Danbury next attempts to escape the consequence of its own admission of the commercial success of atenolol by arguing that the sales data in the Black affidavit

---

**57.** "A prima facie case of nexus is generally made out when the patentee shows both that there is commercial success, and that the thing (product or method) that is commercially successful is the invention disclosed and claimed in the patent. When the thing that is commercially successful is not coextensive with the patented invention … the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold." *Demaco Corp.*, 851 F.2d at 1392.

**58.** The challenger, therefore, must come forward with evidence to demonstrate that the commercial success was due to extraneous factors other than the patented invention, for example, advertising, superior workmanship. *Demaco Corp.*, 851 F.2d at 1393.

**59.** PX 45

fails to consider price differences between various b-blockers. Danbury in particular comments that the price factor has a dramatic effect because the patent on a proprietary brand of propranolol has expired and propanolol is now available as a generic drug at significantly lower prices. The Court, however, has not received any *evidence* by affidavit or otherwise to substantiate this point.

Danbury asserts that a more appropriate method to compare the relative success of different b-blockers is to consider the total amount of annual prescriptions for each b-blocker. Danbury refers to data showing that for 1989 TENORMIN had a market share, in terms of prescriptions written, of 29.3%, whereas both trade and generic forms of propranolol had a market prescription share of 28.3%.[60] The remaining b-blockers had a prescription market share of 42.4%. This data is inconclusive and of no probative value as it is limited to 1989 only, and does not indicate whether in terms of prescriptions written, TENORMIN's market share either has declined or held steady since its introduction into the market. This data also is not correlated for prescriptions written for hypertension or angina in the manner set forth in the Black affidavit.

In conclusion, defendant has not satisfactorily rebutted the prima facie case of a nexus between the commercial success of TENORMIN and the patented invention. This commercial success is probative of the nonobviousness of the inventions claimed in 5 of the '671 patent and claims 1 and 2 of the '032 patent. This apparent commercial success is one factor which weighs in favor of the validity of these claims.

## IV. CONCLUSION

The Court has reviewed the evidence defendant has presented in support of its summary judgment motion in light of the four factual inquiries of *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). This analysis indicates that Danbury has not demonstrated a prima facie case of obviousness of any of the

claims of the subject patents under 35 U.S.C. § 103. In the alternative, assuming the existence of a prima facie case of obviousness, ICI has responded with adequate rebuttal evidence to create several genuine issues of material fact. Danbury, therefore, has not met its burden under F.R.C.P. 56(c) to warrant granting of the summary judgment motion.

Danbury's motion for summary judgment is denied. An appropriate order shall be entered.

### APPENDIX I

*U.S. Patent No. 3,836,671:*

1. A pharmaceutical composition useful for producing β-adrenergic blockade which comprises as active ingredient, an effective amount of at least one alkanolamine derivative selected from the group consisting of a compound of the formula:

$$R^2 - A - \langle \rangle - OCH_2 \cdot CHOH \cdot CH_2NHR^1$$
$$R^3$$

wherein $R^1$ is isopropyl or t-butyl, $R^2$ is carbamoyl or alkylcarbamoyl of up to 4 carbon atoms, A is alkylene of 1 to 5 carbon atoms or alkenylene of 2 to 5 carbon atoms and $R^3$ is hydrogen, halogen or alkyl, alkenyl or alkoxy each of up to 4 carbon atoms; and a non-toxic, pharmaceutically-acceptable acid-addition salt thereof, in association with the pharmaceutically-acceptable diluent or carrier therefor.

2. The composition of claim 1 wherein the active ingredient is 1–p–carbamoyl-methylphenoxy–3–isopropylamino–2–propanol or a non-toxic, pharmaceutically-acceptable acid-addition salt thereof.

3. The composition of claim 1 which is in the form of a tablet or capsule containing between 25 and 200 mg. of active ingredient.

4. The composition of claim 1 which is a sterile aqueous solution containing between 0.05 and 1% w./v. of active ingredient.

**60.** DX 20.

5. A method for the treatment or prophylaxis of angina pectoris and cardiac arrhythmias in warm-blooded animals which comprises administering orally, parenterally or by inhalation to said animals an effective amount of at least one active ingredient as defined in claim 1.

## APPENDIX II

*U.S. Patent No. 3,934,032:*

1. A method for the treatment of hypertension in a warm-blooded animal in need of such treatment which comprises administering orally, parenterally or by inhalation to said animal an effective amount of at least one alkanolamine derivative selected from the group consisting of a compound of the formula:

$$R^2 — A —\langle\!\!\!\!\bigcirc\!\!\!\!\rangle — OCH_2 . CHOH . CH_2NHR^1$$
$$R^3$$

wherein $R^1$ is isopropyl or t-butyl, $R^2$ is carbamoyl or alkylcarbamoyl of up to 4 carbon atoms, A is alkylene of 1 to 5 carbon atoms or alkenylene of 2 to 5 carbon atoms and $R^3$ is hydrogen, halogen or alkyl, alkenyl or alkoxy each of up to 4 carbon atoms; and a non-toxic, pharmaceutically acceptable acid-addition salt thereof.

2. The method of claim 1 wherein the alkanolamine derivative is 1–p–carbamoylmethyl–phenoxy–3–isopropylamino–2–propanol or a non-toxic, pharmaceutically acceptable acid-addition salt thereof.

APPENDIX III

## Application History

UK 9445/69
Filed 2/21/69
Priority Appln.

UK 47048/69
9/24/69

US 9,451
Filed 2/6/70
(the '451 Appln.)
PX 4

UK 55028/70
11/19/70

US 199,011
11/15/71

UK 53544/71
11/18/71

CIP

CIP

US 233,781
Filed 3/10/72
(the '781 Appln.)
PX 5

US Patent 3,663,607
Filed 5/16/72
(the '607 Patent)
PX 1

DIVISIONAL

US 461,262
Filed 4/15/74
(the '262 Appln.)
PX 6

US Patent 3,836,671
Issued 9/17/74
(the '671 Patent in Suit)
PX 2

US Patent 3,934,03
Issued 1/20/76
(the '032 Patent in Suit)
PX 3